2010 WY 66

In the Matter of the Workers' Compensation Claim of James MOSS, Appellant (Petitioner),

v.

STATE of Wyoming, ex rel., Wyoming Workers' Safety and Compensation Division, Appellee (Respondent).

No. S–09–0124.

Supreme Court of Wyoming.

May 25, 2010.

Representing Appellant: Donna D. Domonkos, Cheyenne, Wyoming.

Representing Appellee: Bruce A. Salzburg, Wyoming Attorney General; John W. Renneisen, Deputy Attorney General; James Michael Causey, Senior Assistant Attorney General.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1]   After doctors certified him as having reached maximum medical improvement from a work related back injury, James Moss applied to the Wyoming Workers' Safety and Compensation Division (Division) for permanent total disability (PTD) benefits. The Division denied his claim and the Medical Commission held a contested case hearing. Based upon the evidence presented, the Medical Commission concluded Mr. Moss did not meet his burden of proving that he was entitled to PTD benefits and denied his claim. Mr. Moss appealed to the district court, which affirmed the denial of benefits. On appeal to this Court, Mr. Moss asserts the Medical Commission did not properly allocate the burden of proof as required under the odd lot doctrine. We affirm.

## ISSUE

[¶ 2]   Mr. Moss states the issue for this Court's determination as follows:

> Whether the [Medical Commission] abused its discretion, [or] acted arbitrarily, capriciously or otherwise not in accordance with [the law] when it failed to follow the evidentiary procedure of the odd lot doctrine.

The Division asserts the Medical Commission's decision was supported by substantial evidence, was not arbitrary and capricious and was in accordance with Wyoming law.

## FACTS

[¶ 3]   In March of 2003, while working for Greene's Energy Service, Mr. Moss suffered a lumbar injury when an auger he was operating struck a rock and he was thrown to the ground.[1]  Mary Neal, M.D., an orthopedic surgeon, concluded Mr. Moss had herniated a disc at L5–S1. Mr. Moss filed a claim with the Division for temporary total disability (TTD) benefits which, after an initial denial, the Division awarded.

[¶ 4]   For nearly a year after the work injury, Mr. Moss received conservative treatment involving oral and injected medications and chiropractic care. Ultimately, Dr. Neal recommended surgery. In March of 2004, she performed a laminectomy at L5–S1 and an L4–S1 fusion with a hip graft and hardware installation.

[¶ 5]   Mr. Moss became ill after the surgery. Thinking the hardware might be the cause, Dr. Neal performed another surgery in October 2004 to remove the hardware. Mr. Moss continued to have pain and Dr. Neal referred him to a pain management clinic where he was seen by Dr. Kyle Matsumura. From 2005 through the hearing date, Dr. Matsumura treated Mr. Moss on a regular basis for pain by injection, neurotomy[2] and prescription narcotics.

[¶ 6]   In the course of treatment after the lumbar fusion, several doctors concluded that the fusion had failed. In 2007, Dr. Neal recommended that Mr. Moss undergo a revision fusion. Mr. Moss decided against the procedure because there was no guarantee it would result in a successful fusion, resolve his pain or increase his functional capacity.

[¶ 7]   Meanwhile, in 2005, at the Division's request, Dr. Michael Kaplan reviewed Mr. Moss's medical records, physically examined him and gave him a 23% whole person impairment rating. Dr. Kaplan also concluded that Mr. Moss had reached maximum medical improvement. The Division issued a final determination terminating TTD benefits, giving Mr. Moss a 23% whole body impairment rating reduced by 10% for his 1995 impairment award and awarding him $7,123.97 in permanent partial impairment benefits.

[¶ 8]   In 2006, Dr. Neal certified to the Division that Mr. Moss was permanently totally disabled as a result of the 2003 injury. Mr. Moss applied for PTD benefits. The

---

1.   This was Mr. Moss's second work-related back injury. In 1995, while working for a different employer, Mr. Moss ruptured a disc in his lower back. His physician performed a discectomy and imposed permanent lifting and bending restrictions. The Division awarded Mr. Moss a 10% whole person impairment award as a result of that injury. Mr. Moss returned to work in 1997.

2.   Neurotomy is the dissection or cutting of nerves. *Stedman's Medical Dictionary* 1214 (27th ed. 2000).

Division denied the claim and referred the case to the Medical Commission. After a contested case hearing, the Medical Commission concluded Mr. Moss did not meet his burden of proving that he was entitled to PTD benefits and denied his claim. He appealed to the district court, which upheld the denial, and then he appealed to this Court.

## STANDARD OF REVIEW

[¶ 9] In considering an appeal from a district court's review of an administrative agency's decision, we give no special deference to the district court's decision. *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 8, 188 P.3d 554, 557 (Wyo.2008). Instead, we review the case as if it had come directly to us from the administrative agency. *Id.* Our review is governed by Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2009), which states:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 10] When an administrative agency determines that the burdened party failed to meet his burden of proof, we decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. *Dale*, ¶ 22, 188 P.3d at 561. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bush v. State ex rel. Wyoming Workers' Compensation Div.*, 2005 WY 120, ¶ 5, 120 P.3d 176, 179 (Wyo. 2005) (citation omitted). Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings. *Id.*

[¶ 11] The question of whether the evidence establishes a prima facie case that an injured worker's physical impairment coupled with other factors such as his mental capacity, education, training and age places him within the odd lot category is a factual one for the agency to determine. *Worker's Compensation Claim of Cannon v. FMC Corp.*, 718 P.2d 879, 885 (Wyo.1986). If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. *Dale*, ¶ 22, 188 P.3d at 561. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did based on all the evidence before it. *Id.* We review an agency's conclusions of law *de novo*, and will affirm only if the agency's conclusions are in accordance with the law. *Id.*

## DISCUSSION

[¶ 12] Mr. Moss contends the Medical Commission incorrectly ruled that he failed to prove his entitlement to PTD benefits. He asserts the Medical Commission reached that conclusion because it did not apply the standards for determining his right to bene-

fits under the "odd lot" doctrine. Had the Medical Commission applied the proper standards, he contends, it would not have denied him benefits. The Division responds that substantial evidence supported the Medical Commission's ruling that Mr. Moss failed to prove he is permanently totally disabled.

[¶ 13] The applicable Wyoming Workers' Compensation Act provision defined the term "permanent total disability" as "the loss of use of the body as a whole or any permanent injury certified under W.S. 27–14–406, which *permanently incapacitates the employee from performing work at any gainful occupation for which he is reasonably suited by experience or training.*" Wyo. Stat. Ann. § 27–14–102(a)(xvi) (Lexis-Nexis 2007) (emphasis added.) We have said the statutory definition for permanent total disability is consistent with the odd lot doctrine, which permits a finding of PTD "in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well known branch of the labor market." *Nagle v. State ex rel. Wyoming Workers' Safety & Comp. Div.*, 2008 WY 99, ¶ 11, 190 P.3d 159, 165 (Wyo.2008), quoting *Cardin v. Morrison–Knudsen*, 603 P.2d 862, 863–64 (Wyo.1979). Under the odd lot doctrine, a claimant who is not actually permanently totally disabled is able to receive permanent total disability benefits because the claimant's disability and other factors make the claimant de facto unemployable. *State ex rel. Wyoming Workers' Safety & Comp. Div. v. Pickens*, 2006 WY 54, ¶ 14, 134 P.3d 1231, 1236 (Wyo.2006).

[¶ 14] To be entitled to an award of benefits under the odd lot doctrine, an employee must prove: 1) he is no longer capable of performing the job he had at the time of his injury and 2) the degree of his physical impairment coupled with other factors such as his mental capacity, education, training and age make him eligible for PTD benefits even though he is not totally incapacitated. *Id.* To satisfy this burden, an employee must also demonstrate he made reasonable efforts to find work in his community after reaching maximum medical improvement or, alternatively, that he was so completely disabled by his work-related injury that any effort to find employment would have been futile. *Anaya v. Holly Sugar Corp.*, 928 P.2d 473, 475–76 (Wyo.1996). If the employee meets his burden, the employer must then prove that "light work of a special nature which the employee could perform but which is not generally available in fact is available to the employee." *Gilstrap v. State ex rel. Wyoming Workers' Comp. Div.*, 875 P.2d 1272, 1274 (Wyo.1994).

[¶ 15] Mr. Moss asserts that he proved the degree of his physical impairment, coupled with other facts such as his mental capacity, education and training, placed him prima facie in the odd lot category, making him eligible for PTD benefits even though he is not totally incapacitated. *Pickens*, ¶¶ 13–14, 134 P.3d at 1236. He asserts that he also demonstrated that he made reasonable efforts to find work in his community after reaching maximum medical improvement. *Anaya*, 928 P.2d at 476. He contends the burden then shifted to the Division to prove, which it failed to do, that special work of a light or sedentary nature was actually available to him so as to disqualify him from PTD benefits under the odd lot doctrine. *Gilstrap*, 875 P.2d at 1274.

[¶ 16] The Division responds that the Medical Commission's decision is supported by substantial evidence. It contends Mr. Moss did not meet his burden of proving that he was so disabled that he could not be employed in some fashion and substantial evidence supported the Medical Commission's conclusions that his injury did not prevent him from performing work at a gainful occupation. Therefore, the Division asserts, the Medical Commission was not required to further analyze his claim under the odd lot doctrine.

[¶ 17] We begin our discussion by noting the facts that were not disputed at the contested hearing:

— Mr. Moss sustained a work-related disc herniation in 2003;

— Dr. Neal performed a laminectomy and fusion in 2004;

— The fusion performed in 2004 was not successful, leaving Mr. Moss with pseudoarthrosis [3] and chronic pain;

---

3. Pseudoarthrosis is "A new false joint arising at the site of an ununited fracture." *Stedman's*

— Dr. Neal recommended a revised fusion, however, there is no guarantee it would increase Mr. Moss's work capability or decrease his pain;

— Mr. Moss requires high doses of narcotic pain medication to lessen the pain;

— Mr. Moss suffers from major depressive disorder, anxiety disorder due to his unresolved injury, and pain disorder, associated with both psychological factors and his general medical condition;

— Mr. Moss has a 23% whole body impairment as a result of his 2003 injury;

— Mr. Moss is no longer capable of performing the job he had at the time of his injury;

— In 2005, the Social Security Administration determined that Mr. Moss was disabled within the meaning of the Social Security Act and awarded him benefits beginning March 14, 2003.

[¶ 18] With the above facts established, Mr. Moss was left with the burden of proving at the hearing that the degree of his physical impairment, coupled with other factors such as his mental capacity, education and training, placed him prima facie in the odd-lot category, making him eligible for PTD benefits even though he is not totally incapacitated. *Pickens,* ¶¶ 13–14, 134 P.3d at 1236. To that end, Mr. Moss presented the certification from Dr. Neal, who treated him from March 2003 up to the time of the hearing in 2008, that he is permanently totally disabled and unable to return to gainful employment. He also presented Dr. Neal's 2005 recommendation that he is unable to work eight hours per day, could sit, stand, and walk for thirty minutes at a time, needed to lie down for thirty minutes every two hours, could occasionally lift 5 pounds but rarely lift 10 to 20 pounds, and could not do repetitive bending, stooping or crawling or be exposed to vibrations for extended periods.

[¶ 19] Mr. Moss also presented an independent medical evaluation performed two months before the hearing by Dr. Tuenis D. Zondag in which Dr. Zondag concluded that Mr. Moss is permanently totally disabled and unable to return to work. Mr. Moss also presented evidence of a psychological evaluation presented to the Social Security Administration in which it was concluded that he had some cognitive deficits involving concentration and memory that would make it difficult to learn, remember and carry out simple instructions.

[¶ 20] Consistent with the medical records, Mr. Moss testified at the hearing that he was taking the following medications: 10 mg Percocet every four hours as needed for pain; 20 mg OxyContin three times per day for pain; 2 mg Ativan twice per day for anxiety; 5 mg Valium twice per day for muscle spasms; and 60 mg Cimbalta once per day for depression. Mr. Moss also presented medical records showing that since February 2005 he has received nerve blocks [4] at the pain management clinic several times per year and sometimes as often as once per month. He testified that the medications and injections make it possible for him to get up, move around and perform some activities. In between activities, he lays down for an hour or more. He testified that he can stand from one-half to one hour at a time and sit for several hours. Without the medications, he testified, he is in great pain and rarely performs any activities. He presented evidence that the narcotic medications make it unlikely he would be allowed to drive as part of any job he might obtain.

[¶ 21] In addition to the medical evidence, Mr. Moss presented evidence that he has a high school diploma and attended college for six months. He was 38 years old at the time of the hearing and had worked as a carpenter, pipe fitter and equipment operator prior to working in the oil field for twelve to fifteen years. At the time of his injury in 2003, he was a crew foreman and field supervisor/equipment operator. Mr. Moss presented some sixty-five pages documenting his

*Medical Dictionary* 1269 (27th ed. 2000). The doctors in Mr. Moss's case refer to the condition variously as pseudoarthrosis, non-union of the lumbar fusion, incomplete fusion, failed back syndrome or a broken back.

4. A nerve block is the "interruption of conduction of impulses in peripheral nerves or nerve trunks by the injection of a local anesthetic solution." *Stedman's Medical Dictionary* 214 (27th ed. 2000).

search for work in 2006. The documentation reflects that he submitted applications for over thirty jobs.

[¶ 22] Given the evidence Mr. Moss presented, there is no question but that he met his burden of showing that the degree of his physical impairment coupled with other factors such as his mental capacity, education, training and age make him eligible for PTD benefits. There was no dispute that bones in his lumbar region are not fused. He testified that he experiences incapacitating pain unless he is heavily medicated and even then he cannot stand or sit for long periods but needs to lie down frequently throughout the day. He suffers from major depressive disorder, anxiety disorder and pain disorder as a result of his unresolved back injury. He has been diagnosed with some cognitive deficits involving concentration and memory that would make it difficult to learn, remember and carry out simple instructions. He has a high school diploma and his training and experience are in jobs he cannot do with his work restrictions. The narcotic medications he takes will not allow him to drive as part of any job he might obtain. He presented evidence that two doctors concluded he is permanently totally disabled. He has applied for over thirty jobs. Mr. Moss presented substantial evidence that his disability combined with other factors makes him de facto unemployable. *Pickens,* ¶ 14, 134 P.3d at 1236.

[¶ 23] To refute Mr. Moss's case, the Division presented evidence intended to show that Mr. Moss was not totally disabled within the meaning of § 27–14–102(a)(xvi) or the odd lot doctrine. The Division presented a video showing Mr. Moss working around his yard in May of 2007. The Division also relied on the reports of three doctors who examined Mr. Moss at the Division's request and concluded he was capable of medium level employment. Relying on job applications Mr. Moss completed in which he stated he could not perform the particular job even with accommodations and was looking only for part-time work, the Division also attempted to show Mr. Moss did not really look for work.

[¶ 24] The Medical Commission concluded Mr. Moss's evidence was unpersuasive and ruled that Mr. Moss did not meet his burden of proving that he was permanently totally disabled as defined in § 27–14–102(a)(xvi) or as required for application of the odd lot doctrine. The Medical Commission reached this conclusion after finding from the evidence presented that Mr. Moss is capable of working in the light to medium category of work in a gainful occupation for which he is reasonably suited. In arriving at this result, the Medical Commission rejected much of the evidence presented by Mr. Moss, including his testimony at the contested case hearing, his reports to, and the opinions of, his treating doctors contained in medical records spanning from March 2003 to March 2008, and his work search records.

[¶ 25] The Medical Commission found Mr. Moss's testimony unpersuasive in part because of his demeanor at the hearing and the Division's surveillance video. Addressing the video, the Medical Commission stated:

The video shows Moss working around his home in a rural area, and doing activity of some type in a corral and in a barn or shed. He is shown walking without having the appearance of being in pain, and then tarping down something with a blue plastic tarp. Also evident from the video was that Moss has two horses. The video significantly shows Moss lifting what appears to be a large sheet of some material, approximately 4′ × 8′, that appeared to be plywood. He lifted this material over his head against the side of or onto the roof of the shed. He is also seen carrying lumber and garden tools.

The second day shown in the video showed Moss watering the yard with a hose for an extensive period of time. He is also seen bending over several times without any apparent problem or difficulty, squatting down several times, and moving and walking easily without any obvious problem or evidence of pain. Moss is seen sprinting up a flight of stairs at his home and also on several occasions, working on a large 4–wheeler while bent over. The video also showed Moss and his wife pushing this large all terrain vehicle. Moss is further seen sitting in the front seat of his pickup reaching into the back seat. Later,

Moss is seen working on the large 4–wheeler while on his knees.

[¶ 26] The Medical Commission stated:

10. The Panel does not find the testimony of Moss credible. The [Division's] videos [5] call into question Moss' truth and veracity in general. They also call into question the accuracy of the subjective complaints related to his doctors and therefore the opinions of his doctors who rely on such statements. Moss' appearance, ability to sit, stand and walk is contrary to the records. Moss' testimony sounded as though it was practiced and rehearsed. He also seemed angry. Moss certainly has a financial stake in the outcome of this case especially since neither he [n]or his wife . . . work. There is a real question regarding Moss' desire to work given his lack of pursuit of vocational rehabilitation and transparent efforts at a "job search."

11. Moss is a high school graduate and took college courses where he did above average. Moss is only 38 years old. He has had several jobs and some managerial experience. He appears to be healthy and well developed. He was able to easily sit, stand, and walk during the hearing without apparent pain. He can walk in a picket line. Video evidence showed Moss working in the yard, walking, bending over, squatting, kneeling, lifting, sprinting up stairs, and engaging in many activities without any apparent pain or limitation. He could work on machinery, push a large four wheeler, and reach behind him. Moss testified and [the] record shows he is capable of engaging in many activities as well as recreational activities. His pain is a four to a six out of ten. He can stand one-half to one hour, and sit several hours in an office type chair.

[¶ 27] In addition to Mr. Moss's demeanor at the hearing and the video, the Medical Commission relied on the reports of the three doctors to whom the Division referred Mr. Moss for impairment ratings or independent medical evaluations in 2005, 2007 and 2008. In his 2005 report, Dr. Michael Kaplan relied on and agreed with a functional capacity evaluation (FCE) performed in January of 2005 at Dr. Neal's request placing Mr. Moss in the medium duty category, allowing him to lift or carry 55 pounds occasionally, 27 pounds frequently and 10 pounds constantly. Dr. Brent Clyde who examined Mr. Moss and reviewed his medical records in June of 2005, also agreed with the FCE, stating in his report that Mr. Moss "is at mild to moderate level and certainly should not perform any strenuous lifting, pushing, pulling, or repetitive bending." Finally, Dr. Bruce Newton evaluated Mr. Moss in 2007 and concluded that restricted duty was appropriate. Specifically, "a 50–pound lifting restriction is appropriate, with the avoidance of repetitive heavy lifting and repetitive bending and stooping. Ideally employment that allows change of position would be best suited, although a sitting-type job would not do him harm."

[¶ 28] While finding the conclusions of Drs. Kaplan, Clyde and Newton persuasive, the Medical Commission found the opinions of Dr. Neal unpersuasive. The Medical Commission stated:

It appears from Dr. Neal's deposition and correspondence that Dr. Neal is being an advocate for her patient. Of concern to the Panel is that the treatment notes from Dr. Neal show that she would only talk to Moss and look at radiographic studies. It does not appear she actually examined him. Likewise, . . . it appears Dr. Neal's opinion is based on the subjective reports from Moss. She does not explain her disagreement with the functional capacity evaluation, or with the opinions of those doctors who found Moss able to work. It appears she has not seen the videos of Moss nor has she explained those videos. Based on Moss' own testimony and the videos, it is clear that Dr. Neal's restrictions and limitations have no basis in reality.

As with Dr. Neal, the Medical Commission concluded Dr. Zondag's opinion was not persuasive because he "certified Moss as permanently disabled before ever seeing him,"

---

5. A second video, which is not part of the record, apparently showed Mr. Moss walking a picket line outside his employer's business.

based his opinion on Mr. Moss's subjective complaints, did not explain his disagreement with the functional capacity evaluation or with the doctors who concluded Mr. Moss could work and apparently had not seen the videos.

[¶ 29] The question we must answer is whether substantial evidence supported the Medical Commission's decision to reject Mr. Moss's evidence or whether, instead, the Medical Commission's decision is contrary to the overwhelming evidence in the record as a whole. *Dale*, ¶ 22, 188 P.3d at 561. This is a difficult case. There is no question that Mr. Moss sustained a serious injury that has not been medically resolved. There is also no question that at the time of the hearing, Mr. Moss continued to receive regular treatments intended to lessen the pain he experiences as a consequence of the injury. Additionally, it is clear that Mr. Moss's injury prevents him from returning to the type of work he has done all of his life, but does not render him completely incapacitated. The only question for determination at the hearing was whether the degree of his physical impairment coupled with other factors made him eligible for PTD benefits even though he is not totally incapacitated.

[¶ 30] The Medical Commission's conclusion that Mr. Moss was not eligible for PTD benefits was based in large part on its finding that his testimony was unpersuasive. Ordinarily, credibility determinations are left to the fact finder. The difficulty in this case, however, is that we are unable to discern a rational premise from its findings for, in effect, disregarding his testimony. The Medical Commission concluded that Mr. Moss's appearance and ability to sit, stand and walk at the hearing belied his subjective complaints. Yet, the hearing lasted just two hours and twenty minutes. Apparently, Mr. Moss sat, stood and walked in that time period. It was uncontested that he was taking two pain medications at the time of the hearing and continuing to receive nerve block injections to relieve his pain. Yet, the Medical Commission made no mention of these facts in concluding that Mr. Moss's appearance was contrary to his subjective complaints.

[¶ 31] The Medical Commission's further observations that Mr. Moss's credibility was impacted because he "seemed angry" and "has a financial stake in the outcome" are of little significance. Every claimant has a financial stake in the outcome of his or her worker's compensation benefits claim and it is likely that more than a few are angry about their situation. These observations do not support the Medical Commission's conclusion that Mr. Moss was not credible.

[¶ 32] The Medical Commission also relied heavily on the video showing Mr. Moss performing various activities outside his home. The video is part of the appellate record and this Court has viewed it in its entirety. The first segment, taken May 5, 2007, beginning at 2:35 p.m. and ending at approximately 2:58 is of very poor quality. Mr. Moss is seen for less than five of the twenty-three minutes mostly walking in the vicinity of a shed. Of most significance is the portion where he can be seen lifting a piece of material approximately three feet wide and seven feet long and placing it on top of the shed. The second segment, taken at 4:20 p.m. on May 7, 2007, and lasting ten minutes, shows Mr. Moss watering his yard with a hose. This segment is significant because Mr. Moss is seen bending, squatting and pulling the hose. The last two segments, taken on May 7, 2007, beginning just after 6:00 p.m. and lasting approximately eleven minutes, show Mr. Moss changing the oil in a small sport utility vehicle and, with a woman's help, pushing the vehicle off a ramp. In this segment, Mr. Moss is also seen bending and kneeling.

[¶ 33] Having reviewed the video, we find no rational basis for the Medical Commission's determination that it calls into question Mr. Moss's truth and veracity. It shows Mr. Moss engaged in activities for only a few minutes at different times in two days. There is nothing shown in the video that is inconsistent with Mr. Moss's testimony that when medicated he can perform activities around his home for brief periods. There is also nothing in the video that is inconsistent with Dr. Neal's assessment that he can stand, sit and walk for thirty minutes at a time, lift 5 pounds occasionally, 10 to 20 pounds rarely and 50 pounds never and should not do repetitive bending, stooping or

crawling. The Medical Commission's statement that the video showed Mr. Moss watering his lawn for "an extended period" is an overstatement. The Medical Commission's conclusion that the video showed Mr. Moss doing activities "without any apparent pain" is not supported by the record. The video is of such poor quality that it is not possible to see Mr. Moss's facial expressions and there is no sound. The longest segment in which Mr. Moss appears is approximately ten minutes and there are longer segments where Mr. Moss is not in view at all. Even if the Medical Commission's assessment was correct and Mr. Moss did not exhibit symptoms of pain, that conclusion does not undermine his testimony that he can perform activities for limited periods while medicated. The video does not support the Medical Commission's conclusion to disregard Mr. Moss's testimony and subjective complaints.

[¶ 34] The Medical Commission also concluded "there is a real question regarding Moss' desire to work given his lack of pursuit of vocational rehabilitation and transparent efforts at a 'job search.'" To qualify for benefits under the odd lot doctrine, Mr. Moss was not obligated to pursue vocational rehabilitation. As we said in *Rose v. Westates Constr. Co.*, 703 P.2d 1084, 1088 (Wyo.1985),

> Our statutory definition with respect to the odd-lot doctrine is limited to those gainful occupations for which the employee is reasonably suited by experience or training at the time of the injury, and does not encompass any obligation on the part of the injured employee to enter into any training program in order to improve his chances of employment.

[¶ 35] In characterizing Mr. Moss's job search efforts as transparent, the Medical Commission focused on three or four of the thirty-some job applications Mr. Moss submitted, one in which Mr. Moss stated he could not perform the job even with accommodation and two or three others in which he indicated he was looking for part-time work. On the basis of these few applications, the Medical Commission concluded he did not want to work and had not really looked for a job. The Medical Commission ignored the greater number of applications in which Mr. Moss was not asked how many hours he could work, indicated his hours could be determined after he was hired, or stated he would work "any" hours or was seeking full-time employment. The overwhelming weight of the evidence does not support the Medical Commission's conclusion that Mr. Moss's efforts to find employment were transparent.

[¶ 36] The Medical Commission also concluded the opinions of Dr. Neal and Dr. Zondag were so unpersuasive as to be in effect disregarded. Dr. Neal treated Mr. Moss for five years. Contrary to the Medical Commission's conclusion that her opinions were based entirely on his subjective complaints and a review of the radiographic studies, the records reflect that Dr. Neal physically examined Mr. Moss on a number of occasions between 2003 and 2008. She also referred Mr. Moss to at least four other doctors and two physical therapists all of whom examined him at her request and submitted their findings to her. A fair inference can be drawn that in addition to the radiographic studies and Mr. Moss's subjective complaints, Dr. Neal's opinions were based upon her objective findings and those of the providers to whom she referred Mr. Moss. The Medical Commission's conclusion to the contrary may have been based upon Dr. Newton's statement that Dr. Neal's opinions were based on subjective reports rather than objective findings; however, that statement is not borne out by the medical records.

[¶ 37] The Medical Commission concluded Dr. Zondag's opinion was not persuasive because "he certified Moss as permanently disabled before ever seeing him." It is true that the certification form signed by Dr. Zondag is dated March 20, 2008, and his report indicates he examined Mr. Moss five days later on March 25, 2008. However, a review of the record reflects that Dr. Zondag could not have signed the certification on March 20 because the letter from Mr. Moss's counsel to Dr. Zondag initiating the evaluation and enclosing the blank certification form is dated March 21. Even if the letter was hand-delivered, which there is no suggestion it was, Dr. Zondag would have received it at the earliest on March 21. Given the March 21 date on the letter and the fact that Mr. Moss's counsel is in Rock Springs

while Dr. Zondag was in Casper, it is more likely Dr. Zondag received the letter on March 22 or 23, examined Mr. Moss on March 25 and incorrectly dated the certification form.

[¶ 38] The Medical Commission's further conclusion that Dr. Zondag, like Dr. Neal, based his opinion on Mr. Moss's subjective complaints rather than objective findings is also not supported by the evidence. Dr. Zondag's sixteen page report clearly reflects that in addition to obtaining a history from Mr. Moss (which Dr. Zondag concluded was consistent with the medical records), reviewing the medical records from 1995 through 2007, reviewing a questionnaire and pain inventories completed by Mr. Moss and interviewing him, Dr. Zondag also physically examined Mr. Moss. A fair inference can be drawn that Dr. Zondag's opinions were based upon all of these factors, including the physical examination.

[¶ 39] In addition to disregarding Mr. Moss's testimony and the opinions of Drs. Neal and Zondag, the Medical Commission noted its disagreement "for the reasons stated" with the Social Security Administration's determination that Mr. Moss is disabled. The only "reason" the Medical Commission gave was its observation that it was not clear from the materials submitted "whether the disability determination relates entirely to the low back injury as opposed to the low back injury coupled with other factors." The odd lot doctrine expressly covers claims under the Wyoming Workers' Compensation System in which evidence of the claimant's physical impairment, "coupled with other factors," places him in the odd lot category. *Schepanovich v. U.S. Steel Corp.*, 669 P.2d 522, 528 (Wyo.1983). To the extent the Medical Commission disregarded evidence of the Social Security disability determination because it may not have related entirely to the low back injury, the determination is inconsistent with the odd lot doctrine which clearly involves consideration of other factors.

[¶ 40] In summary, we are unable to discern a rational basis for the Medical Commission's disagreement with the Social Security determination and rejection of Mr. Moss's testimony and the opinions of Dr. Neal and Dr. Zondag. The record indicates that the Medical Commission disregarded

relevant evidence, made incorrect assumptions about other evidence and, rather than considering the evidence fairly and objectively, generally viewed it in the light most likely to result in a denial of benefits. An employee has a right to be heard before an unbiased, fair and impartial tribunal. *Board of Trustees v. Spiegel*, 549 P.2d 1161 (Wyo. 1976); *Ririe v. Board of Trustees*, 674 P.2d 214 (Wyo.1983). Some of the Medical Commission's findings and conclusions cast doubt on whether the proceedings in this case satisfied that right.

[¶ 41] Having concluded the record does not support the Medical Commission's determination to in effect disregard Mr. Moss's testimony and the opinions of Drs. Neal and Zondag and that Mr. Moss met his initial burden of showing his entitlement to PTD benefits, we consider whether the Division came forward with sufficient evidence to refute Mr. Moss's evidence and to prove work within his limitations was available. As discussed in paragraph 27 above, in addition to Mr. Moss's appearance at the hearing and in the surveillance video, the Division relied on the reports of Drs. Kaplan, Clyde and Newton to show that Mr. Moss was capable of working. All three doctors were asked by the Division to give Mr. Moss an impairment rating. All three doctors obtained a history from Mr. Moss, reviewed his medical records, heard his subjective complaints and performed a physical examination.

[¶ 42] After initially concluding in January of 2005 that Mr. Moss "more than likely will need to find a position in the sedentary to light duty category, avoiding frequent bending / stooping / kneeling motions, with the ability to change positions every two hours for relief of positional related pain," Dr. Kaplan changed his opinion after reviewing the results of the FCE performed at about the same time and agreed with the occupational therapist's conclusion that Mr. Moss was capable of medium level work, meaning he could lift and carry 55 pounds occasionally, 27 pounds frequently and 10 pounds constantly. Dr. Clyde's assessment four months later was that Mr. Moss was "at mild to moderate level and certainly should not perform any strenuous lifting, pushing,

pulling, or repetitive bending." Dr. Newton concluded in 2007 that, while Mr. Moss was not permanently totally disabled, restricted duty was appropriate with a 50 pound lifting restriction and the avoidance of repetitive heavy lifting, bending and stooping. In 2008, Dr. Kaplan was asked to review his earlier rating of Mr. Moss. Again, he reviewed Mr. Moss's medical records and history, heard his subjective complaints and physically examined him. He concluded:

> I cannot define Mr. Moss's status as "permanently totally disabled" per [§ 27-14-406]. He is able to function throughout the day with various activities as noted. He has been classified in the past per his FCE as "medium" relevant to his abilities. Of course the patient's back is not "normal", and I would not doubt that he has pains even extending up into the thoracic area, with myofascial irritability.
>
> However, he functionally should be able to perform independently with his [activities of daily living], and in some capacity in order to sustain gainful employment in the work setting. Relevant to his past experience, he is not going to be able to exert as a foreman. He is on medications which may be fairly potent pertaining to clearance for driving heavy equipment or certainly with a CDL, yet in the lighter duty fields, he may have options that have less responsibility and no regulation pertaining to the intake of lower dose narcotic medications.

[¶ 43] In addition to the opinion of three doctors that Mr. Moss was capable of gainful employment with restrictions, the Division presented evidence that light duty work was available to Mr. Moss. Relying on a vocational evaluation performed at the request of Mr. Moss's attorney, the Division pointed out that the evaluator concluded Mr. Moss could find work in his geographic area in jobs such as cashier, rental clerk, telemarketer, desk clerk and customer representative. Given this evidence, we conclude substantial evidence supported the Medical Commission's ruling that Mr. Moss is not entitled to benefits under the odd lot doctrine. Although we are unable to discern a rational basis for the Medical Commission's decision to reject much of Mr. Moss's evidence, the impairment ratings the Division presented called into question the opinions of Dr. Neal and Dr. Zondag. The Division also presented evidence that light work was available in the geographic area in which Mr. Moss resides. That we might have reached a different result is not grounds for reversal. We cannot conclude that the Medical Commission's ruling was against the overwhelming weight of the evidence.

[¶ 44] Affirmed.

HILL, Justice, dissenting.

[¶ 45] I respectfully dissent. I agree with all the majority has to say in ¶¶ 1–43. However, I do not agree with the majority's conclusions in ¶¶ 42–45, and most especially its decision to affirm the Medical Commission's order that Moss was not eligible for permanent disability benefits, as well as the district court's order affirming that decision.

[¶ 46] In the case *In re Nagle*, 2008 WY 99, ¶ 11, 190 P.3d 159, 164–66 (Wyo.2008) we summarized the law applicable to the odd lot doctrine:

> In addition, we are called upon to review this case in light of the odd lot doctrine:
>
> ... This court has long recognized the odd lot doctrine with respect to permanent total disability determinations made within the purview of the Wyoming Worker's Compensation Act. In the case of *Schepanovich v. United States Steel Corp.*, 669 P.2d 522, 525 (Wyo.1983) this court stated:
>
> In our opinion in *Cardin v. Morrison–Knudsen*, Wyo., 603 P.2d 862 (1979), this court adopted a definition of the "odd-lot doctrine" as follows:
>
> "... The 'odd-lot doctrine' is described in 2 Larson, Law of Workmen's Compensation, § 57.51 at p. 10–109 (1976), as providing that *permanent total disability ' may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well known branch of the labor market.'* " 603 P.2d at 863–864.
>
> An injured workman who comes within the "odd-lot doctrine" need not

show that he is totally incapable of doing any work at all in order to be entitled to an award for permanent total disability. *E.R. Moore Co. v. Industrial Commission,* 71 Ill.2d 353, 17 Ill.Dec. 207, 376 N.E.2d 206 (1978); *Wilson v. Weyerhaeuser Company,* 30 Or.App. 403, 567 P.2d 567 (1977); and 2 Larson, Workmen's Compensation Law, § 57.51, at 10–164.21 (1982). This court has stated the proposition in this fashion:

"... The theory of counsel for the employer appears to be that the workman must go further than to show that he cannot do any hard work; that he must also show that he cannot do light work. Of course, *it would almost be impossible, in many instances, for a man educated only to do hard work, to show that at some time or other some good Samaritan might not turn up and offer him some light work which he might be able to do.* The law does not require impossibilities. It is stated in 71 C.J. 1071 that 'where it is found that the employee is permanently and totally disabled so far as hard or manual work is concerned, but that he might do light work of a special nature not generally available, the burden is on the employer to show that such special work is available to the employee.' ..." *In re Iles,* 56 Wyo. 443, 452, 110 P.2d 826 (1941).

This court went on further to enunciate in *Schepanovich,* at 528:

The burden of proof initially is assigned to the injured workman who is seeking to qualify as permanently totally disabled under the "odd-lot doctrine" to demonstrate that he is incapacitated "from performing any work at any gainful occupation for which he is reasonably suited by experience and training." Section 27–12–405(a), W.S.1977; *Cardin v. Morrison–Knudsen,* supra. The test to be invoked is *whether the workman is so disabled that the services which he is reasonably equipped to perform by his experience and training are not marketable in a well-known branch*

*of the labor market in the community so as to provide a steady and continuous source of income rather than sporadic or intermittent employment.* See 2 Larson, Workmen's Compensation Law, § 57.51 (1982). If that showing is made, the burden of proof is then shifted to the employer to show that light work of a special nature which the employee could perform but which is not generally available in fact is available to the employee. *In re Iles,* supra; *Cardin v. Morrison–Knudsen,* supra.

Finally, this court adopted the following rule formulated in 2 Larson, Workmen's Compensation Law, § 57.61, at 10–164.95 to 1–164.114 (1982) through its opinion in *Schepanovich,* at 528–29:

"... If the evidence of degree of obvious physical impairment, coupled with other facts such as the claimant's mental capacity, education, training, or age, places claimant prima facie in the odd-lot category, *the burden should be on the employer to show that some kind of suitable work is regularly and continuously available to the claimant. Certainly in such a case it should not be enough to show that claimant is physically capable of performing light work, and then round out the case for non-compensability by adding a presumption that light work is available* ....

"The corollary of the general-purpose principle just stated would be this: If the claimant's medical impairment is so limited or specialized in nature that he is not obviously unemployable or relegated to the odd-lot category, it is not unreasonable to place the burden of proof on him to establish unavailability of work to a person in his circumstances, which normally would require a showing that he has made reasonable efforts to secure suitable employment...."

Other jurisdictions in this context have held that an employee in circumstances similar to those of the appel-

lant must show that reasonable efforts have been made to obtain suitable employment in order to meet their burden of proof and shift the burden of proof to the employer. *Wiedmaier v. Industrial Commission,* 121 Ariz. 127, 589 P.2d 1 (1978); *Oliver v. Wyandotte Industries Corporation,* Me., 360 A.2d 144 (1976); *Marez v. Kerr–McGee Nuclear Corporation,* 93 N.M. 9, 597 P.2d 1178 (1978) (Sutin, J., specially concurring); *Haines v. State Accident Insurance Fund,* 27 Or.App. 793, 558 P.2d 367 (1976); *Shealy v. Algernon Blair, Inc.,* 250 S.C. 106, 156 S.E.2d 646 (1967). See also cases cited in 2 Larson, Workmen's Compensation Law, § 57.61 at 10–164.114, n. 29 (1982).

. . . .

In § 27–14–102(a)(xvi) (Lexis 1999) there appears a definition of permanent total disability, which reads as follows:

(a) "Permanent total disability" means the loss of use of the body as a whole or any permanent injury certified under W.S. 27–14–406, which permanently incapacitates the employee from performing work at any gainful occupation for which he is reasonably suited by experience or training.

The claim of Vaughan that he is totally disabled is presented under the phrase relating to a condition which "permanently incapacitates the employee from performing work at any gainful occupation for which he is reasonably suited by experience or training." It is of significance that the legislature specifically used the words "gainful occupation" in this definition which suggests its concurrence with those policy considerations utilized previously by this court in support of the adoption of the odd lot doctrine. In fact, this court has previously recognized the statutory definition for permanent total disability is consistent with the odd lot doctrine. *Gilstrap v. State ex rel. Workers' Compensation Div.,* 875 P.2d 1272, 1274 (Wyo.1994) (citing *City of Casper v. Bowdish,* 713 P.2d 763, 765 (Wyo.1986) and *Cardin v. Morrison–Knudsen,* 603 P.2d 862, 863–64 (Wyo.1979)).

*Vaughan v. State ex rel. Workers' Compensation Division,* 2002 WY 131, ¶¶ 8–12, 53 P.3d 559, 562–63 (Wyo.2002). [Emphasis added.]

[¶ 47] The majority concludes that the evidence introduced by the Division from Dr. Kaplan, Dr. Clyde, and Dr. Newton constituted "sufficient evidence" to refute Moss's evidence to the effect that he could not perform even light duty work because he could not stand or sit for more than 30–60 minutes without then having to lie down to get relief from his pain. The majority asserts that the Division also came forward with evidence that there was light duty work available to Moss in his community that met Moss's needs. The Medical Commission decided that Moss's job search was a sham because he conceded that he was doing as instructed, even though he "knew" he was not capable of performing the jobs for which he was applying.

[¶ 48] I begin my analysis by noting a series of principles and circumstances that must be viewed as determinative in this case. I would reject the Medical Commission's determination that there is work available that is within Moss's physical limitations (which, of course, includes the facts that he is walking around with what is essentially a broken back, the level of pain that he experiences almost constantly, and the anxiety and depression that is ancillary to that pain, and his inability to "work" and earn a living). The evidence offered by the Division was not the sort of evidence that "a reasonable mind would accept as adequate to support a conclusion." The majority has already rejected most of the Medical Commission's findings that negatively impacted Moss's case. That circumstance leads me to view with distrust this final finding made by the Commission, which now must bear the entire weight of the final decision to deny Moss the benefits at issue here.

[¶ 49] We noted in both the *Nagle* case and *Tarraferro v. State ex rel. Wyoming Medical Com'n,* 2005 WY 155, 123 P.3d 912 (Wyo.2005) case that medical science has very few reliable tools which can accurately assess the presence or severity of pain. *Nagle,* 190 P.3d at 159 (and see fn. 1); also see

Ann K. Wooster, Annotation, *Standard and Sufficiency of Evidence When Evaluating Severity of Claimant's Pain in Social Security Disability Case Under § 3(a)(1) of Social Security Disability Benefits Reform Act of 1984, 42 U.S.C.A. § 423(d)(5)(A)*, 165 A.L.R. Fed. 203, §§ 1–8, 10, 38 (2000 and Supp.2008–2009); Alec Berezin, *Thresholds of Pain*, 8 Am.Jur. P.O.F.3d 91 (1990 and Supp.2009); I.J. Schiffres, Annotation, *Pain as "Disability" Entitling Insured to Disability Benefits Under § 103 of the Social Security Act (42 USC § 423)*, 23 A.L.R.3d 1034 (1969 and Supp.2009); 4 Larson's Workers' Compensation Law, § 83.07 (Pain as a Factor in Disability Determinations) (2009).

[¶ 50] I note, as well, that we have held that the testimony of an injured worker alone is sufficient to prove injury. *Ikenberry v. State ex rel. Wyo. Workers' Comp. Div.*, 5 P.3d 799, 803 (Wyo.2000). Moreover, I think our cases bear out over the years that treating physicians should be credited with having the most comprehensive knowledge of the injured worker's condition, although that is not to say that independent medical examinations cannot be useful for some limited purposes. I would also note that the Medical Commission declined to give any weight to the Social Security Administration's (SSA's) decision to award Moss disability benefits. While Wyoming's worker's compensation scheme and the SSA's disability process constitute two different sources of insurance benefits for injured workers, I deem it more demonstrative of a social/political bias, than a "finding of fact," for the Medical Commission to wholly ignore the processes of the SSA. The Medical Commission should at least have had the good sense to acknowledge that SSA disability determinations are made after what can only be described as an onerous testing process and such determinations cannot be blithely cast aside as irrelevant. To disagree with facts after diligent study is one thing; to simply ignore them because they pose a very significant hurdle to the Medical Commission's desired result is another.

[¶ 51] The Division has brought to bear an unusually large cadre of experts in its attempt to dispute Moss's claims, and the evidence provided by his treating physicians (claims of chronic, debilitating pain, anxiety and depression, and what amounts to a bro-

ken back). Both the Medical Commission, and the Division's experts, relied on some surreptitious video-taping of Moss's activities (although the snippets of film shed light on less than an hour's worth of Moss's life). The Medical Commission, and at least one of the experts hired by the Division, misused that evidence to a degree that can only be considered maliciously irresponsible. For instance, at the top of page 16 of its findings (¶ O), the Commission interpreted a piece of the film as showing Moss "sprinting up a flight of stairs at his home." Moss did not "sprint," although he moved at a brisk walk, but there were only two steps involved, from his yard to a small porch that led to the door of his mobile home. Moss is said to repeatedly bend, stoop and squat in the video, when in fact he bends slightly forward a few times, apparently to pick up small pieces of debris from the area he is watering with a hose. It was contended that Moss picked up a heavy piece of material (plywood?) and lifted it with ease onto an outbuilding. Moss brought that item to the hearing and it was a piece of tin that he slid onto the roof of the building, from a relatively low height, using the overhang of the roof as a weight bearing surface and then sliding the 8 pound piece of tin onto the roof. Even a superficial review of the video surveillance evidence mandates a conclusion that it did nothing to support the Medical Commission's findings or the findings made in the IME reports. On the contrary, the credit given that evidence by the Medical Commission calls into question the fact-finding capacity of the Commission and its experts (¶ Y, page 21; ¶ 10, page 25).

[¶ 52] In addition to ignoring the SSA determination, and crediting the surveillance video as supporting findings that it simply cannot support, I add the following examples wherein the Medical Commission played loose and fast with the facts: (1) See pages 3–4, ¶ 4; wherein the Commission blames Moss's injury on a congenital condition, as well as on his failure to observe his pre–2003 work effort restrictions (now that his condition has worsened considerably, the Commission contends he is more physically capable now than he was before the 2003 injuries and the failed surgery with hardware removal); (2) throughout its findings the Medical Com-

mission refers to exhibits which cannot be located using its citations to the record; (3) In ¶ 15, pp. 6–7, fn. 1, the Medical Commission notes that Moss "has not submitted any evidence that his impairment rating of 23% was in error." When, in fact, that is what this case is all about (Moss's condition steadily deteriorated after the date of that determination).

[¶ 53] The majority credits Bruce Y. Newton, M.D., with "hearing" Moss's subjective complaints and performing a physical examination. Dr. Newton appears to have been recruited by the Division to do a sort of last-minute IME to add to its already exiting arsenal of IME's. If, in fact, Dr. Newton did listen to Moss's complaints about his pain and give him a physical examination, little mention of it can be found in his report. Dr. Newton ends his report, conceding that he spent a total of three hours "including face-to-face time with the patient, subsequent review of a large stack of medical records, and generation of this [17 page] report." The report is largely a regurgitation of what is contained in the medical records that appear in the record on appeal, including Dr. Clyde's and Dr. Kaplan's reports. Interestingly, the first bit of "medical evidence" Dr. Newton reviewed was a "video surveillance." That piece of video is not in this record, but it apparently shows Moss involved in a labor/management dispute and he has his girlfriend's children with him. Dr. Newton noted:

> I have viewed surveillance video showing James in front of a prior place of employment with a picket sign directed negatively at his employer. Most of the time he is sitting, but he is also viewed standing and walking about. In addition, two young children are recruited for the same process. One holds a sign saying, "I am hungry because of the employer," another sign indicating that "my daddy is handicapped because of this employer." No strenuous activity is observed, although one occasion he is shaking his MRI scan at cars as they drive in and out of the place of employment.

[¶ 54] In response to the first question the Division asked Dr. Newton to answer (is Moss permanently totally disabled), this is the first paragraph of his response:

> The video surveillance does not necessarily give evidence one way or the other. It does give an interesting snapshot into the character of Mr. Moss, and I find it highly unfortunate that he would recruit young children into his world of bitterness and disability. Such behavior can only be detrimental to the development of a child's character and reflects the inward focus of his existence.

On that basis alone, I would disregard Dr. Newton's report in its entirety. Moreover, Dr. Newton's report is cumulative of Dr. Kaplan's report and Dr. Clyde's report. My view of those reports is that Dr. Kaplan disagreed with the treating physicians, Dr. Clyde agreed with Dr. Kaplan, and Dr. Newton, in turn, agreed with Drs. Clyde and Kaplan. I would not credit them with being three separate pieces of evidence attesting to Moss's ability to do light duty work. To the extent the Division demonstrated that light duty work was available, I would conclude that that demonstration was little more than a showing that "some good Samaritan might ... turn up and offer him some light work which he might be able to do."

[¶ 55] In light of all these circumstances, I would apply the last of the standards of review articulated in *Dale*. The decision of the Medical Commission was arbitrary and capricious and it should not be abided, much less affirmed. I would remand this matter to the district court with instructions that the Medical Commission's order be reversed and that this matter be further remanded to the Division with instructions that Moss be awarded the applicable permanent disability award for which he applied and to which he is entitled.