# IN THE SUPREME COURT, STATE OF WYOMING

## 2013 WY 28

### OCTOBER TERM, A.D. 2012

### March 12, 2013

TYLER L. STALLMAN,

**Appellant**
**(Petitioner),**

v.

STATE OF WYOMING ex rel.
WYOMING WORKERS' SAFETY
AND COMPENSATION DIVISION,

**Appellee**
**(Respondent).**

S-12-0172

*Appeal from the District Court of Niobrara County*
*The Honorable Keith G. Kautz, Judge*

*Representing Appellant:*
    Brian J. Hunter of McKellar, Tiedeken & Scoggin, LLC, Cheyenne, Wyoming

*Representing Appellee:*
    Gregory A. Phillips, Wyoming Attorney General; John D. Rossetti, Deputy
    Attorney General; Michael J. Finn, Senior Assistant Attorney General; Kelly
    Roseberry, Assistant Attorney General.

*Before KITE, C.J., and HILL, VOIGT, BURKE, and DAVIS, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**DAVIS**, Justice.

[¶1]    Appellant Tyler L. Stallman worked for the Wyoming Department of Corrections at the Wyoming Women's Center in Lusk, Wyoming.  She sustained significant injuries during a vehicle rollover while driving to pick up a prisoner in Sheridan.  After receiving a 22% permanent partial impairment award from the Wyoming Workers' Safety and Compensation Division (the Division), she applied for permanent total disability (PTD) benefits.  The Division denied her application, finding that she did not meet the statutory definition of permanent total disability.  Ms. Stallman requested a contested case hearing, and the case was referred to a panel of the Medical Commission (the Commission or panel).

[¶2]    Based upon the evidence presented, the Commission concluded that Ms. Stallman did not meet her burden of proving that she was entitled to PTD benefits under the odd lot doctrine. The district court affirmed, and Ms. Stallman appealed to this Court, claiming that the Commission's final order was unsupported by substantial evidence and contrary to applicable law due to improper application of the odd lot doctrine.  We hold that Ms. Stallman presented a prima facie case showing that she was unemployable in her community due to her injuries, and that the Division failed to rebut this showing by demonstrating that there was in fact gainful employment available to her within a reasonable geographic area.  We reverse the district court's order affirming the Commission's final order, and we remand this matter to the district court with directions that it remand the case to the Commission for further proceedings consistent with this opinion.

## ISSUE

[¶3]    Was the Commission's determination that Ms. Stallman was not entitled to permanent total disability benefits under the odd lot doctrine supported by substantial evidence and consistent with applicable law?

## FACTS

### Accident and Injuries

[¶4]    On November 10, 2006, Tyler Stallman was working as a correctional officer for the Wyoming Women's Center in Lusk, Wyoming.  She was driving to Sheridan in a state car to pick up an inmate when she encountered icy conditions on a bridge over Interstate 25 north of Douglas.  She lost control of the vehicle, which spun out of control and rolled down an embankment.   After she was extricated from the vehicle by emergency personnel,  Ms. Stallman was transported first to Memorial Hospital of Converse County, and then transferred to Wyoming Medical Center (WMC) in Casper.  There is no dispute that the accident occurred in the scope and course of her employment.

1

[¶5]    Ms. Stallman suffered from multiple pelvic fractures, pulmonary and bodily contusions, a chipped tooth, and an impacted humeral head fracture of the right shoulder. A doctor's notes indicated that "[t]he accident appears to have been quite significant." Ms. Stallman was hospitalized for a week, during which her pelvic fractures were stabilized. She later underwent several surgeries, including a rhinoplasty[1] and a resurfacing arthroplasty of the right shoulder. After she was released from WMC, Ms. Stallman attended physical therapy and counseling for post-traumatic stress disorder (PTSD), and she participated in several years of post-operative care and rehabilitation directed by doctors at Casper Orthopedic Associates.

## Benefits Sought

[¶6]    Ms. Stallman did not return to her job as a corrections officer, but instead tendered her resignation and applied for worker's compensation benefits. The medical expenses related to the accident were paid in full by the Division. She applied for and received temporary total disability benefits until she was assigned a 22% permanent impairment rating and began receiving permanent partial impairment (PPI) benefits. She also applied simultaneously for permanent partial disability (PPD) benefits and permanent total disability (PTD) benefits.[2]

[¶7]    The Division denied her application for PPD benefits, and the Office of Administrative Hearings (OAH) upheld its determination on summary judgment as a matter of law. Both found that she had not actively sought work as required by Wyoming Statute § 27-14-405(h)(iii). The district court upheld the OAH's determination, but we reversed on appeal. *Worker's Comp. Claim of Stallman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 147, 288 P.3d 707 (Wyo. 2012). We found that the Division had arbitrarily imposed a deadline for submission of documentation of efforts to locate a job not provided for by its rules, and that the six week period during which an applicant for PPD must seek employment under the Division's rules could span the date of application, rather than falling entirely on one side or the other of that date. *Id.*, ¶¶ 18–26, 288 P.3d at 714–15. We also noted that the legislature "expressly directed in § 27-14-101 (LexisNexis 2011) that the Wyoming Worker's Compensation Act be construed to assure 'the quick and efficient' delivery of benefits to injured and disabled workers and that 'claims be decided on their merits.'" *Id.*, ¶ 20, 288 P.3d at 715. We remanded the case for an evidentiary hearing on the merits, noting that "[t]he manner in which Ms.

---

[1] A surgery to repair her nose.

[2] Wyoming Statute § 27-14-403 provides statutory guidelines for the calculation of worker's compensation benefits, including PPD and PTD benefits. Wyo. Stat. Ann. § 27-14-403(a) (LexisNexis 2011). PPD benefits are generally paid "for the number of months determined by multiplying the percentage of impairment by sixty (60) months," whereas PTD benefits are typically paid for eighty months, with an offset for previous PPD awards. § 27-14-405(g); § 27-14-406(a).

Stallman's claim has been treated satisfies neither of these objectives." *Id.*, ¶¶ 26–27, 288 P.3d at 716.

[¶8]    The Division also denied Ms. Stallman's application for Permanent Total Disability (PTD) benefits, finding she did not meet the statutory definition of permanent total disability pursuant to Wyo. Stat. Ann. § 27-14-102(a)(xvi) (LexisNexis 2005).[3]  The proceedings related to that claim are the subject of this separate appeal.

### *Impairment Ratings*

[¶9]    Evidence of impairment ratings was submitted in support of Ms. Stallman's application for PTD benefits.  Dr. Anne MacGuire, a Casper rheumatologist, provided the first impairment rating on Ms. Stallman after an evaluation which took place on June 24, 2008.  Dr. MacGuire  noted that Ms. Stallman had reached maximum medical improvement on April 23, 2008, that she was able to sit, stand and squat to 50% without difficulty, and that her balance was "reasonable."  Ms. Stallman's self-evaluation of her own condition indicated that: (1) she was able to drive from Casper to Lusk; (2) she could stand for  one  hour before needing to rest; (3) she could sit for half an hour before becoming uncomfortable; and (4) she was in consistent pain.  Using the sixth edition of the AMA Guides to  Evaluation of Permanent Impairment, Dr. MacGuire rated Ms. Stallman at a 20% whole person impairment: 15% right shoulder, 3% pelvis, and 2% left shoulder. Dr. MacGuire believed that Ms. Stallman was medically stable,  and recommended that she return to work with some limitations.

[¶10]  Ms. Stallman obtained a "Second Opinion Impairment Rating" from Dr. Michael Kaplan, a physical medicine and rehabilitation specialist, on October 9, 2008.  Dr. Kaplan found that her pelvic fractures had healed satisfactorily, but that the pain from her shoulder fracture increased with activity.  He rated Ms. Stallman at a 22% whole person impairment: 20% based upon the upper extremities and 2% on the pelvis.  He noted that Ms. Stallman would not return to her previous job as a correctional officer "because of her multisystem problems, especially relevant to the shoulders and pelvis."  He believed that she could return to the work force in the future in a more limited capacity, and he recommended that she avoid squatting, kneeling, and lifting items heavier than twenty to twenty-five pounds.  The Division awarded Ms. Stallman a PPI rating of 22% based on Dr. Kaplan's evaluation, and she accepted it without objection.

### *Treatment Records*

[¶11]  Ms. Stallman was treated by orthopedic surgeons Dr. Craig Smith and Dr. Steven Orcutt.  Their clinical notes record the following:

---

[3] The 2005 version of the Wyoming Worker's Compensation Act was in effect at the time of the November 2006 injury, and we will refer to those statutes throughout.

- 02/22/2007: "I have discussed that she has had several missed appointments in therapy and the patient became quite tearful and states that she, since her accident, is afraid to leave her house. She often times stays at home and does not attend family functions such as Sunday dinners. She is concerned or fearful that she is going to be hit by another vehicle when she is driving on the street, particularly on a snowy day or during bad weather. I feel she certainly has some posttraumatic psychological issues . . . . The patient is very willing to proceed with some type of therapy so she can feel better." (Dr. Orcutt)

- 03/08/2007: "At some point, she clearly will require rehabilitation training and we will notify Worker's Compensation of this." (Dr. Orcutt)

- 10/22/2007: "Patient worked at the penitentiary. I do not see her at this point in time getting back to that type of work status given her multiple problems. I think occasional rehabilitation would be very appropriate to pursue at this juncture." (Dr. Smith)

- 1/30/2008: "Due to her impairment, I feel she is not capable of going back to work as a corrections officer due to the physical demands required in that job. It would be best to go to a vocational rehabilitation program and be trained for a more sedentary-type work environment." (Dr. Smith)

[¶12] Annie Haack, a Physician's Assistant (PA) employed by Dr. Smith, noted that there was "no improvement" as of March 2009, and that Ms. Stallman would not able to return to active duty as a correctional officer. After a December 2009 visit, Ms. Haack reiterated that there were no jobs available for Ms. Stallman at her former workplace due to her restrictions.

[¶13] Ms. Stallman also sought counseling for post-traumatic stress disorder from Jack Herter, Ph.D, a clinical psychologist, and Jane Stearns, M.S., a professional counselor. Following counseling sessions in January of 2008, Dr. Herter noted:

> Since the accident, she reported having nightmares, intrusive thoughts, flashbacks, and panic attacks in response to trauma related and/or trauma like stimuli. For example, snowy, windy conditions; hearing the sound of the wind; and driving. However, as a mother with a 5-year-old son, she forces herself to drive locally, but she does so in [a] state of intense stress, while worrying and gripping the steering wheel tightly. As she recounted the details of the accident, the patient exhibited visible signs of anxiety an [sic] autonomic arousal. She tensed. She trembled. She fidgeted. Her face flushed.

4

> Her pupils dilated. All of this confirmed a diagnosis of PTSD, directly related to her work-related injury.

Ms. Stearns' notes indicated that "Tyler reports symptoms including panic sensations and anxiety associated with driving," and that "[s]he is very open in expressing her desire to get her life back to normal and feeling a strong sense of loss regarding her physical injuries."

### *Functional Capacity Evaluation*

[¶14] Dr. Smith referred Ms. Stallman to Lanae Pickard, an occupational and physical therapist, for a functional capacity evaluation (FCE). The evaluation was performed in October of 2009. The FCE concluded that Ms. Stallman was incapable of performing her pre-injury jobs of corrections officer, guard, resident care aide, waitress, dining room attendant, or stock clerk. It described a "mismatch" between her demonstrated physical ability and the physical demands of these jobs because she could not lift, push, pull or carry objects weighing more than twenty-three pounds. Ms. Stallman was also unable to lift more than three pounds over her head.

[¶15] Ms. Pickard found the FCE results to be valid: "Overall test findings, in combination with clinical observations, suggest[ed] the presence of full physical effort on Ms. Stallman's behalf." She did not complain of pain during placebo tests, nor did her movement patterns improve with distraction. Her stated levels of pain were also proportional to her movement patterns. Ms. Pickard concluded that Ms. Stallman was best suited to jobs with light to sedentary physical demands, and that she "would perform best in an occupation that allows frequent postural changes, minimal squatting, kneeling, crouching and above shoulder activity."

### *Employability and Wage Earning Assessment*

[¶16] At the request of the Division, Ms. Stallman participated in an employability and wage earning assessment in November of 2010. Delane Hall, M.S., a certified vocational rehabilitation counselor chosen by the Division, noted that Ms. Stallman was thirty years old at the time, and that she had a high school education. Her work history included the following positions: (1) correctional officer from 2005 to 2006; (2) detention officer from 2003 to 2004; (3) resident care and habilitation aide from 2001 to 2003; and (4) various positions as a waitress, cashier, cook and waitress with unknown, earlier dates of employment.

[¶17] The assessment quoted an earlier note from Dr. Smith indicating that "it is certainly reasonable for her to be granted permanent disability." Her treating physicians would not approve her return to active duty as a correctional officer, and Mr. Hall recorded that "the Wyoming Department of Corrections [DOC] noted that they would be

unable to provide Ms. Stallman with a modified or alternative position. Therefore Ms. Stallman does not have any return to work options with the time of injury employer."

[¶18] Ms. Stallman had some skills useful in other occupations, but the assessment noted that she was limited to sedentary to light duty employment. Mr. Hall recommended positions as a hostess, dispatcher, or title clerk given her work history and physical limitations. He conducted a labor market survey of suitable positions available in the state, finding six dispatcher openings in Casper, Newcastle, Rock Springs, Green River, and Gillette; four title clerk positions available in Afton, Ft. Washakie, Torrington, and Laramie; and six restaurant host or hostess positions in Casper, Gillette, Moose, and Cheyenne. He found no positions that Ms. Stallman could perform in Lusk at the time of his evaluation.

[¶19] Mr. Hall believed that hostess jobs may be available in Lusk in the future, but noted that they would result in a significant wage loss compared to her previous jobs. He noted that title clerk and dispatcher positions would likely require relocation or commuting a significant distance to Casper or Douglas. The assessment concluded that Ms. Stallman would probably benefit from vocational retraining, but that she would likely need to relocate to pursue gainful employment. A search worksheet attached to Mr. Hall's report confirmed that Ms. Stallman had contacted thirty employers in Lusk over a six-week period seeking work, and that none were hiring.

### Course of Proceedings

[¶20] Ms. Stallman applied for permanent total disability benefits in December of 2009. The Division promptly issued a final determination letter denying her application because "[r]eview of the medical information on file does not indicate that your condition meets the definition of permanent total disability as defined by Wyoming Statute § 27-14-102(a)(xvi)." She timely appealed this determination, and the case was referred to the Commission for a hearing.

[¶21] The Division filed a motion for summary judgment, alleging that Ms. Stallman's physician had not certified her to be permanently totally disabled as required by Wyoming Statute § 27-14-406(a).[4] The thrust of the Division's argument was that Dr.

---

[4] Section 406(a) reads in pertinent part as follows:

> Subject to W.S. 27-14-602, upon certification by a physician licensed to practice surgery or medicine that an injury results in permanent total disability as defined under W.S. 27-14-102(a)(xvi), an injured employee shall receive for eighty (80) months a monthly payment as provided by W.S. 27-14-403(c) less any previous awards under W.S. 27-14-405 which were involved in the determination of

Smith's PA had certified Ms. Stallman for permanent total disability, and that therefore her application lacked the requisite physician's certification. The Commission granted the motion for summary judgment, finding that "the certification requirement that a 'physician licensed to practice surgery or medicine' is not satisfied by the certification signed by a PA."

[¶22] Shortly thereafter, Ms. Stallman obtained the required certification from Dr. Smith. He generally agreed with the FCE's conclusions, stating that "Tyler would be better [sic] to pursue a [sic] vocational rehabilitation training and pursue a sedentary type job." Ms. Stallman timely moved for relief from the order granting summary judgment on these grounds. The Commission granted her motion for relief and set the matter for a contested case hearing on July 1, 2011.

[¶23] At the hearing, the only witness who testified in person was Ms. Stallman.[5] She testified that she was born and raised in Lusk, and that her family lives there as well. Her family members help her care for her two children, and they also assist with housework that she cannot perform due to her injuries. She checks for suitable open positions in the Lusk Herald classified advertisements weekly, but has found no work she can perform. Inquiries of local businesses have not yielded any open positions for sedentary-type work. Mr. Hall and other vocational rehabilitation counselors have told her that there are no suitable positions for her in Lusk, and they have encouraged her to relocate or go to school to obtain job training.

[¶24] Ms. Stallman also testified that there is no community college in Lusk, and that she is unwilling to relocate or go to school to find a job she can perform or to retrain. She resigned from her position as a correctional officer because her doctor told her that she would be unable to return to work. DOC would not offer her a light-duty or sedentary position because there were no such positions available at the Wyoming Women's Center. She testified that she was unwilling to commute to a nearby town for work, because she experiences PTSD when driving in the winter. On cross-examination by an attorney for the Division, she admitted that she drives to Casper about once a month, and that she had not looked for jobs in Douglas and Torrington. The Court takes judicial notice that Lusk is approximately 54 miles from Douglas, 56 miles from Torrington, 81 miles from Glenrock, and 104 miles from Casper. Questioning by members of the Commission's hearing panel elicited testimony that Ms. Stallman does not use opiates or illegal drugs, and that her application for Social Security Disability Benefits was denied.

---

permanent total disability, and dependent children shall receive an award as provided by W.S. 27-14-403(b).

Wyo. Stat. Ann. § 27-14-406(a) (LexisNexis 2005).

[5] Other witnesses testified by deposition.

[¶25]  The Commission hearing panel, acting as a hearing examiner pursuant to Wyo. Stat. Ann. § 27-14-406(c) (LexisNexis 2005), issued its final order on August 15, 2011. It held that there was "no dispute" that Ms. Stallman was incapable of returning to her job as a correctional officer, but found that Dr. Smith's certification of permanent total disability was inconsistent with his prior statements that Ms. Stallman might pursue sedentary employment.  Relying instead on Dr. Kaplan's deposition testimony that Ms. Stallman could perform some jobs, the Commission concluded that she had not established a prima facie case of permanent total disability under the odd lot doctrine. The district court affirmed, finding that substantial evidence supported the Commission's decision.  This appeal was timely perfected.

## STANDARD OF REVIEW

[¶26]  Under Wyoming Rule of Appellate Procedure 12.09(a), our review of administrative proceedings is limited to a determination of matters specified in Wyoming Statute § 16-3-114(c).  W.R.A.P. 12.09.  That statute provides as follows:

> To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
>
> > (i) Compel agency action unlawfully withheld or unreasonably delayed; and
> >
> > (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
> >
> > > (A) Arbitrary, capricious, an abuse of discretion or otherwise **not in accordance with law**;
> > >
> > > (B) Contrary to constitutional right, power, privilege or immunity;
> > >
> > > (C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) **Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.**

Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2011) (emphasis added).

[¶27]  We recently clarified the standards applicable to our review of a contested worker's compensation case hearing, such as the one which occurred in this case:

> In considering an appeal from a district court's review of an administrative agency's decision, we give no special deference to the district court's decision. . . .
>
> .  .  .
>
> When an administrative agency determines that the burdened party failed to meet his burden of proof, we decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Findings of fact are supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for those findings.
>
> The question of whether the evidence establishes a prima facie case that an injured worker's physical impairment coupled with other factors such as his mental capacity, education, training and age places him within the odd lot category is a factual one for the agency to determine. If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did based on all the evidence before it. We

9

> review an agency's conclusions of law de novo, and will affirm only if the agency's conclusions are in accordance with the law.

*Moss v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 66, ¶¶ 9–11, 232 P.3d 1, 4 (Wyo. 2010) (citing *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶¶ 8, 22, 188 P.3d 554, 557, 561 (Wyo. 2008); *Bush v. State ex rel. Wyo. Workers' Comp. Div.*, 2005 WY 120, ¶ 5, 120 P.3d 176, 179 (Wyo. 2005); *Worker's Comp. Claim of Cannon v. FMC Corp.*, 718 P.2d 879, 885 (Wyo. 1986)) (internal quotation marks omitted).

[¶28]  We acknowledge the significant medical expertise the Commission can bring to bear in certain types of cases. *Worker's Comp. Claim of Decker v. State ex rel. Wyo. Med. Comm'n*, 2005 WY 160, ¶ 33, 124 P.3d 686, 696 (Wyo. 2005).  Many workers' compensation cases involve complex medical issues, and the Commission's role as a fact-finder requires it to parse through the available medical records and testimony, and determine the weight of the available evidence. *Id.*, ¶ 33, 124 P.3d at 696–97.  As is the case for a hearing examiner, the Commission is tasked with determining the credibility of witnesses. *Id.*  However, it "has an obligation to apply its fact-finding expertise in a manner that conforms itself to the governing law." *Nagle v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2008 WY 99, ¶ 15, 190 P.3d 159, 166 (Wyo. 2008).

## DISCUSSION

[¶29]  Ms. Stallman argues that the Medical Commission panel in this case incorrectly ruled that she failed to prove her entitlement to PTD benefits under the odd lot doctrine. She contends that the evidence on which the Commission relied – Dr. Smith's certification, the FCE, Mr. Hall's job market analysis, and her work search documents – irrefutably confirmed that she was incapable of returning to gainful employment in her community.  She contends that if the panel had applied the proper standards under the odd lot doctrine, it would have found that to be the case, and the burden would have shifted to the Division to show that suitable employment was in fact available to Ms. Stallman.  The Division responds that Ms. Stallman failed to prove entitlement to PTD benefits as a result of her injury, and that substantial evidence supports the Commission's application of the odd lot doctrine to the facts of the case.

### *Odd Lot Doctrine*

[¶30]  The Wyoming Worker's Compensation Act (the Act) was enacted to "assure the quick and efficient delivery of indemnity and medical benefits to injured and disabled workers" at a reasonable cost to their employers. Wyo. Stat. Ann. § 27-14-101(b) (LexisNexis 2005); *Streeter v. Amerequip Corp.*, 968 F. Supp. 624, 629 (D. Wyo. 1997) ("The clear language of the Worker's Compensation Act demonstrates that the purpose of the act is to assure quick and efficient delivery of indemnity and medical benefits to

10

injured and disabled workers at reasonable cost to employers."). Section 101 declared the legislature's intent that "benefit claims cases be decided on the merits," but also abolished the common-law rule of liberal construction, recognizing that the Act "is not remedial in any sense . . . ." § 27-14-101(b); *see In re Summers*, 987 P.2d 153, 157 (Wyo. 1999) ("[T]his Court may no longer interpret worker's compensation statutes in favor of coverage . . . ."). However, we still interpret the workers' compensation statutes "in a way that gives effect to the legislative intent and preserves the historic compromise between workers and employers." *Summers*, 987 P.2d at 157.

[¶31]   The odd lot doctrine[6] is a special rule for determining entitlement to permanent total disability under the Worker's Compensation Act under certain circumstances. The Act defines permanent total disability as "the loss of use of the body as a whole or any permanent injury certified under W.S. 27-14-406, which permanently incapacitates the

---

[6] The phrase "odd lot doctrine" originated with Judge Moulton in the early King's Bench case of *Cardiff Corporation v. Hall*:

> If the accident has left the workman so injured that he is incapable of becoming an ordinary workman of average capacity in any well known branch of the labor market—if in other words the capacities for work left to him fit him only for special uses and do not, so to speak, make his powers of labour a merchantable article in some of the well known lines of the labour market, I think it is incumbent upon the employer to shew that such special employment can in fact be obtained by him. If I might be allowed to use such an undignified phrase, I should say that if the accident leaves the workman's labour in the position of an "odd lot" in the labour market, the employer must shew that a customer can be found who will take it . . . .

4 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law*, § 83.02 (2012) (quoting *Cardiff Corp. v. Hall*, 1 K.B. 1009, 1020–21 (1911)). Judge (and later Justice) Cardozo, "who knew an apt phrase when he saw it," restated the doctrine as follows:

> Failure to find work stands upon a different basis when the labor is unmarketable because of the condition of the laborer. There is some basis for a finding that this was the claimant's plight. He was an unskilled or common laborer. He coupled his request for employment with notice that the labor must be light. The applicant imposing such conditions is quickly put aside for more versatile competitors. Business has little patience with the suitor for ease and favor. He is the odd lot man . . . . Work, if he gets it, is likely to be casual and intermittent. . . . Rebuff, if suffered, might reasonably be ascribed to the narrow opportunities that await the sick and halt. In such circumstances, disability, followed by search for work and failure, will justify the inference of diminished earning power.

*Jordan v. Decorative Co.*, 230 N.Y. 522, 525-26, 130 N.E. 634 (1921) (citation omitted) (internal quotation marks omitted); *see* 4 Larson, *supra*, at § 83.02.

employee from performing work at any gainful occupation for which he is reasonably suited by experience or training." § 27-14-102(a)(xvi).  We have recognized that the statutory definition of PTD is consistent with the common law odd lot doctrine, which permits a finding of permanent total disability "in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well known branch of the labor market." *Moss*, ¶ 13, 232 P.3d at 5 (quoting *Nagle*, ¶ 11, 190 P.3d at 165); *see also In re Pickens*, 2006 WY 54, ¶ 14, 134 P.3d 1231, 1236 (Wyo. 2006) (describing how "a claimant who is not actually permanently totally disabled is able to receive permanent total disability benefits because the claimant's disability and other factors make the claimant *de facto* unemployable"); 4 Larson, *supra*, at 83-1 ("Total disability may be found, in spite of sporadic earnings, if the claimant's physical condition is such to disqualify him or her for regular employment in the labor market.").

[¶32]  In *Moss*, we explained the burden-shifting approach under the odd-lot doctrine as follows:

> To be entitled to an award of benefits under the odd lot doctrine, an employee must prove: 1) he is no longer capable of performing the job he had at the time of his injury and 2) the degree of his physical impairment coupled with other factors such as his mental capacity, education, training and age make him eligible for PTD benefits even though he is not totally incapacitated.  To satisfy this burden, an employee must also demonstrate he made reasonable efforts to find work in his community after reaching maximum medical improvement or, alternatively, that he was so completely disabled by his work-related injury that any effort to find employment would have been futile.  If the employee meets his burden, the employer must then prove that light work of a special nature which the employee could perform but which is not generally available in fact is available to the employee.

*Moss*, ¶ 14, 232 P.3d at 5 (citing *Pickens*, ¶ 14, 134 P.3d at 1236; *Anaya v. Holly Sugar Corp.*, 928 P.2d 473, 475–76 (Wyo. 1996); *Gilstrap v. State ex rel. Wyo. Workers' Comp. Div.*, 875 P.2d 1272, 1274 (Wyo. 1994)) (internal quotation marks omitted).

### *Required Showing of* de facto *Unemployability*

[¶33]  The panel found that Ms. Stallman was unable to resume work as a correctional officer, and the Division does not challenge that finding on appeal. The panel's final order turned on the second prong of the odd lot doctrine, because it found that she had failed to prove that her degree of physical impairment, coupled with the skills, education,

and training she possessed at the time of the injury, left her *de facto* unemployable in the community in which she lived. *See Moss*, ¶ 14, 232 P.3d at 5; *Pickens*, ¶ 14, 134 P.3d at 1236.

[¶34] Ms. Stallman's degree of physical impairment was extensively documented by the FCE, two impairment ratings, and the records of her treating physicians. The FCE established that she was unable to push, pull, carry or lift weights in excess of twenty-three pounds. Her treating and evaluating physicians consistently noted that she was incapable of performing the rigorous physical demands of a position as a correctional officer, but that she was capable of returning to light-duty to sedentary work. The Commission agreed with Dr. Kaplan's assessment that Ms. Stallman "can function in a light or sedentary capacity relevant to the medical conditions and problems that she has faced." The question the Commission had to answer was whether light duty or sedentary positions were available for Ms. Stallman in her community; *i.e.*, whether there was "work at any gainful occupation for which [s]he is reasonably suited by experience or training." *See* § 27-14-102(a)(xvi).

[¶35] In *Anaya*, we discussed the availability of suitable employment in a claimant's community with regard to the second prong of the odd lot doctrine. In that case, Mr. Anaya was moving a wheelbarrow full of sugar beets when he slipped and fell, suffering from a herniated disc exacerbated by spondylolisthesis and severe degenerative joint disease. After reaching maximum medical improvement, his treating and evaluating physicians agreed that he would be unable to return to his previous job, but that he could return to light duty work. The Division awarded the claimant a 25% PPI rating, but denied his application for PTD benefits, and the OAH upheld this determination. 928 P.2d at 474–75.

[¶36] On appeal, we affirmed the OAH's decision that Mr. Anaya did not prove his entitlement to PTD benefits under the odd lot doctrine. A rehabilitation specialist assigned to the case testified that a number of light-duty jobs were available in the claimant's hometown of Torrington, including positions as parts assemblers, sorters and stock clerks. "[T]his evidence demonstrated that a job search in Torrington likely would have been successful." *Id.* at 476. Instead of applying for these positions, however, Mr. Anaya "considered himself retired" after his injury, and stopped looking for jobs altogether. Because he did not look for suitable employment or demonstrate that any such efforts would have been futile, he failed to establish a prima facie case of odd lot treatment and shift the burden of proof to his employer to show there was suitable employment in the community. *Id.* at 476–77.

[¶37] This case is in some ways similar to *Anaya*, but it is different in one key respect. Both Ms. Stallman and Mr. Anaya worked physically demanding jobs, both were unable to return to their former positions after reaching maximum medical improvement, and both of their physicians concluded they were limited to light-duty to sedentary positions.

13

However, the rehabilitation specialist in *Anaya* testified that "there is employment that is compatible that has been regularly and continuously available to him in the Torrington area." *Id.* at 476. In contrast, Mr. Hall testified by deposition in this case that ***no*** light-duty to sedentary positions were available for Ms. Stallman in the Lusk area.[7]

[¶38] Ms. Stallman's job search worksheet confirmed that she contacted at least thirty employers in the Lusk area who were not hiring. For reasons which are not at all clear in

---

[7] At Mr. Hall's deposition, which took place on March 23, 2011, the following exchange took place:

> Q. Sure. But there was no employment available for Ms. Stallman?
>
> A. There wasn't a position available that she could, say, walk in and say, "I was applying for this position that you had a current opening for", no.
>
> .   .   .
>
> Q. Okay. As I go through both of your different assessments [labor market surveys conducted in November of 2010 and March of 2011], I notice in here that there are no jobs in Lusk, Wyoming. Is that correct?
>
> A. That's correct.
>
> Q. Okay. And you're aware that Ms. Stallman resides in Lusk; is that correct?
>
> A. Yes.
>
> Q. Okay. Any reason why you didn't obtain any job market results from Lusk?
>
> A. I looked in the Lusk area to try and find some openings. I couldn't find any openings for any of the positions other than -- well, there weren't any positions that I could find in the Lusk opening --
>
> Q. Okay.
>
> A. -- or the Lusk area.
>
> .   .   .
>
> Q. Okay. So, it's your testimony and your understanding that between November of 2000 and . . . – November of 2010 up through the present, you were unable in your search for employment possibilities for Ms. Stallman to locate any opportunities for employment in the Lusk area which she was qualified for based on her training and experience as well as the limitations placed on her by her disability, is that correct?
>
> A. That's correct.

14

the record, the Commission stated it was "not impressed with Mrs. Stallman's efforts at finding employment in her immediate community or her job search record, which is over two years old, and indicates that she did not apply for any of the positions that she apparently inquired about." This statement ignores the obvious – there is no point in applying for jobs that are not available. Our own Justice Blume pithily observed about this sort of speculative effort that "it would almost be impossible, in many instances, for a man educated only to do hard work, to show that at some time or other some good Samaritan might not turn up and offer him some light work which he might be able to do. The law does not require impossibilities." *In re Iles*, 56 Wyo. 443, 452, 110 P.2d 826, 829 (1941).

[¶39] Nonetheless, the Commission panel in this case concluded otherwise, relying on its interpretation of one of Dr. Kaplan's opinions to be that Ms. Stallman did not meet the statutory definition of permanent total disability.

> Dr. Kaplan also opined that Mrs. Stallman was not permanently and totally disabled as defined under the Worker's Safety and Compensation definition in the Wyoming Statutes. The following exchange occurred:
>
> Q. (Attorney [for Division]) In your opinion is Ms. Stallman permanently totally disabled?
>
> A. (Dr. Kaplan) No.
>
> Q. Then why is that your opinion?
>
> A. Well, it would appear that the patient can function in a light or sedentary capacity relevant to the medical conditions and problems that she has faced. And as I understand it, although a patient may not have skills in a sedentary job, based on their background, that's where a retraining program such as those offered with vocational rehabilitation can come and be involved with the patient to allow them to gain an ability to be employed with some additional training that may be out of their immediate skills that they've encountered either on the job or as a result of being in a particular job.
>
> Q. Okay. Do you know what Ms. Stallman's educational background is?

15

A. One second here. High school education.

Q. Okay. And do you know what her complete work history is since she left high school?

A. Well, she didn't give me details. Some patients don't, or some patients may not have other experience, but she's also worked with disabled patients, in the sheriff's office, and as a corrections officer. (Objector/Defendant's Exhibit 4-6, Kaplan's Deposition Pages 11-12).

10. The Medical Panel agrees with Dr. Kaplan that Mrs. Stallman is not permanently and totally disabled as a result of her work injury. We find that Mrs. Stallman has not established a prima facie case for her to be considered as a qualified candidate for "odd lot doctrine" treatment. We find that she is not so disabled, as a result of her work injury that the services which she is reasonably equipped to perform by her experience and training, are not marketable in a well-known branch of the labor market in her community. Mrs. Stallman has a variety of work experiences and skills that we would expect to provide her other [sic] with other opportunities for employment. In addition, Mrs. Stallman's obvious physical impairment (22% whole body), coupled with other facts such as her mental capacity, education, previous work training, and age, further attest to finding that she should not be considered an odd lot claimant. Mrs. Stallman is articulate, is not presently taking any narcotic or psychotropic medication, is not involved in psychological counseling or treatment, and is presently capable of maintaining her home and caring for her two young children. She has a valid driver's license and has transferable skills acquired with her background in law enforcement. She has the residual ability to work in jobs such as dispatcher, title clerk, or a hostess in a restaurant, as noted in the Vocational Evaluation.

[¶40] Ordinarily, the Commission's role as the trier of fact entitles it to determine what probative value to assign to testimony, and to resolve differences in expert medical opinions. *Morgan v. Olsten Temp. Servs.*, 975 P.2d 12, 16 (Wyo. 1999) (citation omitted). However, to qualify as an expert, a witness must first establish his expertise by reference to "knowledge, skill, experience, training, or education." *See* W.R.E. 702. An

expert witness should "be qualified as an expert with regard to each area in which he offers testimony." *Herman v. Speed King Mfg. Co.*, 675 P.2d 1271, 1278 (Wyo. 1984).[8]

[¶41]  Impairment rating physicians like Dr. Kaplan can offer valuable expert testimony regarding a claimant's physical ability and overall limitations.  However, "[a] PPI rating is strictly a medical question and is unrelated to the claimant's ability to work."[9]  *Himes v. Petro Eng'g & Constr.*, 2003 WY 5, ¶ 16 n.1, 61 P.3d 393, 398 n.1 (Wyo. 2003).  Dr. Kaplan testified as follows with regard to his expertise in the area of employability:

> Q. Are you familiar with the types of transferrable skills one
> job that a person has held might be useful in another job?

·   ·   ·

---

[8] *See also Sullivan v. Rowan Companies, Inc.*, 952 F.2d 141, 145 (5th Cir. 1992) (excluding expert testimony in the field of metallurgical engineering where the witness was a geologist with graduate degrees in micropaleontology and microfossils); David H. Kaye, *et al.*, The New Wigmore: A Treatise on Evidence, *Expert Evidence* §3.1.2 at 93  (2d ed. 2011) ("[T]he proponent of expert testimony is required to prove that the proferred expert has special knowledge in the relevant field.") (citation omitted); 3 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 7:8 at 791 (3d ed. 2007) ("Regardless how impressive the background of a witness, his area of expertise should match fairly closely the subject matter of his testimony.  If it does not, or if his background fails to equip him to testify, he does not qualify as an expert.") (citation omitted).

[9] We previously recognized the limitations of impairment rating physicians in the field of vocational evaluation in *Vaughan v. State ex rel. Wyoming Workers' Compensation Division*, 2002 WY 131, 53 P.3d 559 (Wyo. 2002).  The claimant in *Vaughan* underwent a number of surgeries following a work-related injury and applied for PTD benefits following a twenty-three percent impairment rating.  He was unable to return to the workforce in any capacity, according to his treating physician and vocational evaluator, but his impairment rating physician, Dr. Brown, testified that he could return to light-duty or sedentary work.  *Id.*, ¶¶ 13–27, 53 P.3d at 563–66.  A Commission hearing panel relied on Dr. Brown's testimony in finding Mr. Vaughan was not permanently and totally disabled, but we reversed on appeal, holding the Commission erred as a matter of law:

> Dr. Brown, the Division's only witness, stated that this very area of expertise [vocational evaluation] was outside his area of knowledge and was best left for determination by a vocational rehabilitation expert. He also advised that he did not have knowledge of or perform any study or evaluation of the labor market in Sheridan, Wyoming.  Further, we explicitly recognize that Ms. Noecker, a specialist in the vocational arena who had detailed knowledge of the labor market in Wyoming, specifically indicated that Vaughan was not gainfully employable in a well known branch of the labor market in Wyoming so as to provide him with a steady and continuous source of income considering his mental ability, age, experience, training and physical limitations.

*Id.*, ¶¶ 30, 35, 53 P.3d at 566, 567.

A. [Dr. Kaplan] I'm not really sure of what you're asking, but I think you're implying that, for example, if she's working in the sheriff's office, she may have some experience with operating a phone, answering calls, dealing with a triage of people coming in, and making notes, using the computer, so some of those administrative skills, for example, could be transferrable to other administrative jobs.

Q. (By [Division's Attorney]) Okay. You're not qualified to testify as a vocational evaluator though, correct?

A. Correct. I think the vocational evaluators, obviously, are dealing with that question that you just asked, and they also have a more detailed understanding of what job descriptions are applicable in particular fields.

Q. Okay.

A. And they have their own way of surveying patients and obtaining information that is outside the medical model that I'm functioning under.

[¶42] As the above testimony established, Dr. Kaplan unabashedly conceded that he was not qualified to testify about Ms. Stallman's employment skills or opportunities in light of her particular limitations. The panel based Finding No. 10 on a statement for which the required showing of expertise not only was not made, but was expressly denied by the witness.

[¶43] Mr. Hall, on the other hand, testified that he was a specialist in the vocational arena with detailed knowledge of the job market in Wyoming, that he was familiar with the job market in Lusk, and that no jobs were available for Ms. Stallman. *See Moss*, ¶ 14, 232 P.3d at 5 (describing how an employee must seek and be unsuccessful in finding work in his community). The panel's extensive reliance on Dr. Kaplan's testimony as the basis for declining to shift the burden of proof was an error in the application of the law governing the odd lot doctrine, which requires consideration of both a claimant's degree of physical impairment **and** whether the claimant can be "employed regularly in any well known branch of the labor market." *See Moss*, ¶ 13, 232 P.3d at 5 (quoting *Nagle*, ¶ 11, 190 P.3d at 165); *Vaughan*, ¶¶ 30, 35, 53 P.3d at 566, 567 (holding the Commission erred as a matter of law in its misapplication of the odd lot doctrine)).

[¶44] The panel found that Ms. Stallman was limited to light duty or sedentary employment. She made a prima facie showing that there was no such work available in her community, which was adequate to show that she was entitled to the benefit of the

18

odd lot doctrine. At that point, the burden should have shifted to the Division to show that gainful work she could do with her limitations was in fact available in Lusk or within a reasonable distance from Lusk. *See Moss*, ¶ 14, 232 P.3d at 5 ("If the employee meets his burden, the employer must then prove that light work of a special nature which the employee could perform but which is not generally available in fact is available to the employee." (internal quotation marks omitted)). We will accordingly review the record to determine whether the Division did in fact produce sufficient admissible evidence which demonstrated that jobs Ms. Stallman could perform were available.

### *Division's Showing of Available Employment*

[¶45] The Division's showing relies on an unstated premise that Ms. Stallman must either move or commute from Lusk to some other city if necessary to find work. The Division attached several job listings to its pre-hearing disclosure statement: three administrative and secretarial positions with Converse County School District No. 1 in Douglas, an overnight youth care position with a group home in Douglas, a medical office assistant position with the Glenrock Health Center, a head secretary position with the Glenrock School District, and an enigmatic statewide sales position with the R.J. Reynolds Tobacco Company.

[¶46] Larson's treatise on workers' compensation provides an excellent synopsis of the cases describing suitable employment within a claimant's general geographic area:

> [T]he test of reasonableness does not require the claimant to look for work beyond the general area where he or she lives. For example, where one injured worker's need to stop periodically and stretch his back lengthened his commute to two-and-a-half hours – one way – the court held this was unreasonable as a matter of law. Similarly, where the daily commute for a Florida worker would have been 134 miles, a court held the offer of employment was not within "a reasonable geographic area," particularly since the injured worker produced evidence that her neck pains were exacerbated by prolonged driving.
>
> Where it was the worker's habit, prior to his or her injury, to endure a substantial commute, the courts have sometimes been less forgiving.

4 Larson, *supra*, at § 84.01[4] (footnotes omitted). Implicit in the above quote is the rule that an employee need not move from her home to find alternative employment, although she may have to commute a reasonable distance. This is consistent with *Moss*, which

held that a worker had to make a prima facie showing that he had made a reasonable search for work "in his community." 2010 WY 66, ¶ 14, 232 P.3d at 5.

[¶47] The potential positions identified by Mr. Hall were in Torrington, Douglas, and Casper. Torrington and Douglas are approximately 50 miles from Lusk, while Casper is approximately 100 miles distant. A trip from Lusk to either Torrington or Douglas by automobile could easily consume an hour per day each way, depending on weather and traffic conditions. Travel to Casper or the nearby community of Glenrock could take twice as long.

[¶48] The Division produced no evidence indicating that it would be reasonable for a claimant like Ms. Stallman to endure two hours or more of daily commuting and travel a minimum of 500 miles by auto each week given her undisputed physical limitations. She testified that she was unwilling to commute to nearby communities for work because she experiences PTSD when driving in the winter. Dr. Orcutt and Dr. Herter both confirmed that she suffers from fear and anxiety triggered by driving in snowy winter conditions. The functional capacity evaluator and Dr. MacGuire both found that Ms. Stallman was unable to sit for extended periods of time and that she requires frequent postural changes to relieve pain.

[¶49] Ms. Stallman might benefit from vocational rehabilitation and relocation to a less isolated community with more employment opportunities, but she is not required to retrain or move under the odd lot doctrine. *Moss*, ¶ 34, 232 P.3d at 10 ("Our statutory definition with respect to the odd-lot doctrine . . . does not encompass any obligation on the part of the injured employee to enter into any training program in order to improve his chances of employment." (quoting *Rose v. Westates Constr. Co.*, 703 P.2d 1084, 1088 (Wyo. 1985)); *see* Wyo. Stat. Ann. § 27-14-408(a) (LexisNexis 2005) ("An injured employee *may* apply to the division to participate in a vocational rehabilitation program if . . . .") (emphasis added); *McMasters v. State of Wyo. ex rel. Wyo. Workers' Safety & Comp. Div.*, 2012 WY 32, ¶ 63, 271 P.3d 422, 437 (Wyo. 2012) (discussing how the odd lot doctrine focuses on the availability of work in a claimant's community).

[¶50] Under the circumstances, the Division failed to show that gainful employment was in fact available to Ms. Stallman. Recognizing the legislature's intent to "assure the quick and efficient delivery" of worker's compensation benefits, we think it appropriate to remand with directions to award Ms. Stallman PTD benefits in an amount proven by the evidence. *See* Wyo. Stat. Ann. § 27-14-101(b) (LexisNexis 2005); *Vaughan*, ¶¶ 35–36, 53 P.3d at 567 (remanding for an order awarding PTD benefits where the Commission erred as a matter of law in its application of the odd lot doctrine, and substantial evidence would not support a conclusion that the applicant was not entitled to PTD benefits).

## CONCLUSION

[¶51] The application of the odd lot doctrine is undoubtedly more difficult when a claimant lives in an isolated rural community where jobs are scarce. Nonetheless, our cases make it clear that once a claimant shows that she is *de facto* unemployable in her community due to her degree of physical impairment and other factors, the burden shifts to the Division to show that gainful employment was in fact available. The overwhelming weight of the evidence indicates that Ms. Stallman was a prima facie candidate for odd lot treatment, and that the Division failed to establish that light work she could perform was available within a reasonable distance from Lusk. There was an error of law in the application of the odd lot doctrine, and substantial evidence does not support the Commission's conclusions. We accordingly reverse and remand, directing the district court to remand to the Commission for further proceedings consistent with this opinion.