IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Welfare of | ) | No. 34773-7-III |
| | ) | (consolidated with |
| | ) | No. 34774-5-III) |
| A.H.† | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

LAWRENCE-BERREY, J. — Mr. H. and Ms. F. appeal the trial court's order

terminating their parental rights to A.H. We affirm.

FACTS

A.H. was born on October 26, 2014. Hospital workers placed a hold on A.H. after

concerns arose about the mother, Ms. F. Department of Social and Health Services

(DSHS) workers arrived and spoke with Ms. F. and Mr. H. They determined that Ms. F.

smoked marijuana while pregnant, was homeless, and had intellectual issues. They also

---

† To protect the privacy interests of A.H., a minor, we use her and her parents'
initials throughout this opinion. General Order of Division III, *In Re Changes to Case
Title* (Wash. Ct. App. May 25, 2017),
http://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=
2017_002&div=III.

determined that Mr. H. was homeless, smoked marijuana daily, and exhibited controlling behavior toward Ms. F.

DSHS had been involved with Mr. H.'s previous children. Mr. H. admitted to having a 1992 second degree assault conviction for breaking the legs of one of his infants. Mr. H.'s criminal history also included arrests for domestic violence threats to kill, domestic violence assaults involving two of his former girlfriends, and violating no-contact orders.

On October 29, 2014, DSHS filed a petition for dependency. A shelter care hearing took place the same day. The court entered out of home placement for A.H., and the parents agreed to begin services in exchange for visitation rights. Ms. F. agreed to a neuropsychological evaluation and SafeCare. SafeCare is a project designed to show the parents how to raise their child successfully. Mr. H. agreed to random drug testing and SafeCare.

On January 16, 2015, Mr. H. and Ms. F. agreed to dependency and dispositional orders. The court ordered A.H. to remain in out-of-home placement. The court ordered Mr. H. to complete random drug screening and to obtain negative test results, a parenting assessment to determine what services are necessary, a chemical dependency evaluation and to follow any recommended treatment therefrom, a domestic violence assessment,

2

and to demonstrate the ability to meet A.H.'s needs. The court ordered Ms. F. to complete a neuropsychological evaluation and to follow any recommendations therefrom, and to complete a parenting assessment to determine what services were necessary. The services are addressed in turn rather than chronologically.

*Mr. H.'s failure to reduce his dependency on marijuana*

DSHS scheduled Mr. H. for 30 random drug tests during the dependency proceeding. He did not show for 13 of the 30 tests. For the other 17 tests, once he did not submit to testing, and 14 of the remaining 16 tests he tested positive for marijuana. The two other tests did not test for marijuana. Mr. H. admitted to smoking marijuana at least three times per day and was not interested in reducing his use. Mr. H. asserts he began using marijuana recreationally in 1999, but in 2008 started using it for medicinal purposes to treat pain. Mr. H. never received a prescription for medical marijuana and refused to consider other medical alternatives.

Mr. H. participated in a chemical dependency assessment with Iris Aleman in February 2015. The assessment revealed that Mr. H. was dependent on nicotine and cannabis. For cannabis, dependency was evidenced by increased tolerance, inability to cut dosages, multiple failed attempts at reducing usage, daily use, negative consequences on other life activities such as social or occupational activities, and continued use despite

3

negative consequences on health. Ms. Aleman recommended intensive inpatient treatment, but Mr. H. disagreed and said he would seek a different assessment to get a different recommendation. Mr. H. did not engage in inpatient treatment for his chemical dependencies.

Mr. H. completed a second chemical dependency treatment with Kathleen Pajimola on November 30, 2015. This assessment recommended intensive outpatient treatment for Mr. H. to address his dependencies. Mr. H. stated he was willing to treat his dependency to get his daughter back. The outpatient treatment required attendance at three sessions per week, but Mr. H.'s attendance requirements were lowered to one session per week. Mr. H. was eventually discharged for lack of attendance, after having attended only four sessions. Ms. Pajimola addressed these problems with him and he revealed he did not believe there was a problem because marijuana was legal.

*Mr. H.'s noncompliance with domestic violence counseling and slow progression with mental health counseling*

Mr. H. completed a domestic violence assessment on April 14, 2015. The assessment rated Mr. H. as low risk for domestic violence and many other categories, but as a medium risk for truthfulness. Nonetheless, the assessment recommended one year of domestic violence treatment, to begin June 27, 2015. He missed that session and all sessions in July. He missed three sessions in August and attended three or four sessions

each month until December. Except for February 2016, he did not meet the minimal attendance requirements for any month. He was discharged on June 1, 2016, for noncompliance, having not attended a session since April 16, 2016.

Mr. H. also received mental health services from Steven Erickson, starting September 10, 2015. Mr. Erickson identified anger management and impulse control as mental health issues. Mr. H. fully engaged in this program and had stellar attendance from the starting date until trial. Mr. H. had strong progress in the beginning of the sessions, but began to regress. Mr. Erickson reported that Mr. H. was aware that he needed to control his tendencies to display his frustration openly. Mr. Erickson identified that Mr. H. was evicted in part because of these issues. Mr. Erickson was optimistic about Mr. H.'s relationship with A.H., and Mr. H.'s ability to benefit from further treatment. Based on Mr. H.'s pattern of progress and regression, Mr. Erickson estimated it would take four to five months of treatment from the time of trial to make satisfactory progress.

*Ms. F.'s neuropsychological assessment and general failure to attend mental health counseling appointments*

Ms. F. completed a neuropsychological assessment with Dr. Scott Mabee in July 2015, after missing scheduled assessments in March and June. Dr. Mabee attempted to identify emotional and cognitive capabilities with his testing. He identified concerns with

depression, immaturity, and "borderline intellectual functioning." Report of Proceedings (RP) at 430. At trial, Dr. Mabee clarified that Ms. F.'s intellectual functions were "above the area that we talk about in terms of intellectual disability but it's below the average level." RP at 430. He noted that Ms. F. had problems with communicating her thoughts through language, but also noted standard memory. In comparing her results to an intelligence test scale, he scored her at 80 for verbal language processing, and 89 for spatial ability to form concepts. He stated she could identify and process things visually much better than she could communicate her thoughts verbally. Tory Carl, an employee with the DSHS Developmental Disabilities Administration (DDA), determined that Ms. F. was not qualified for DDA services because she had no qualifying condition such as an intellectual disability.

Amanda Clemons performed the first parenting assessment in February 2015 and referred Ms. F. for mental health treatment for concerns over her functioning and ability to identify support systems. For reasons not apparent in the record, she did not begin treatment until September of that year. Her treatment counselor, Gary Woods, reported that Ms. F. missed 12 of 26 sessions, and arrived late for 2 others. Ms. F.'s last in-person treatment occurred in February 2016, and she had one phone contact in April 2016.

*The parents' failure to attend and progress with parenting services*

Mr. H. and Ms. F. started SafeCare services in November 2014. Mr. H. attended only 3 of the 10 sessions. Ms. H. attended only 5 of the 10 sessions. The provider was concerned about the parents' lack of attendance. These services were terminated in January 2015 so the parents could follow the recommendations of a parenting assessment.

The parenting assessment recommended services, including family therapy, as well as an additional second assessment when A.H. was six months older. Ms. Clemons also referred the parents to family therapy as a result of the first parenting assessment, to begin in February 2015. The parents missed four sessions and were discharged from the program. DSHS re-referred them on June 17, 2015, to Tim Hanson for more family therapy. They were discharged from this second program for failure to engage. On July 23, 2015, DSHS again referred them to family therapy. After one month of attempted contact, they finally engaged with this service in September 2015.

In November 2015, and because of their positive engagement with family therapy, Mr. Hanson recommended the parents to attend weekly Promoting First Relationships (PFR) services. After two weeks of PFR, the parents began arriving without the necessary supplies such as milk, diapers, food, and wipes. They attributed the problems

7

to either being late or forgetting. The parents stopped responding to feedback and were transitioned back to family therapy in December 2015.

On return to family therapy, the parents were detached and stopped making progress. They were argumentative and defensive. They attended both of the December 2015 sessions. Mr. H. missed two January 2016 sessions and the therapist became concerned about the parents' increasingly poor attendance and participation. Mr. H. attended only one session in February 2016. Ms. F. missed two February 2016 sessions and arrived alone without milk for a third. She claimed her roommate drank all of A.H.'s milk. In March 2016, the parents began attending all sessions, but continued to arrive without any supplies. One time, the parents brought a workout supplement, Muscle Milk, in place of regular milk. Another time, they brought sugar water. The therapist stated he thought these behaviors reflected parent-centered decision making instead of child-centered decision making. The sessions had positives such as the parents' interactions with A.H., but the therapist was continually concerned about attendance, engagement, both parents missing A.H.'s cues, and Mr. H.'s confrontational and aggressive behavior. The therapist doubted that the parents were able to nurture and care for A.H. Nonetheless, Mr. Hanson again referred the parents to PFR, in addition to continued

8

family therapy. In May 2016, the parents were discharged from family therapy for lack of attendance and engagement.

Ms. F.'s second referral for PFR went poorly. Ms. F. did not appear on time for the first session on April 22, 2016, and, by the time she did arrive, it had already been rescheduled. Ms. F. showed for the second session. Ms. F. did not show for any further PFR sessions, and she was discharged. DSHS found another provider who was willing to work with Ms. F., starting June 2, 2016. Ms. F. did not show for that appointment and she was discharged. No further engagements with PFR occurred.

*The parents' poor attendance with out-of-home supervised visits, and inability to maintain condition of their own home*

The court order provided the parents supervised visitation with A.H. three times per week, with each visit lasting two hours. From November 2014 to September 2015, the visits took place at the Salvation Army. Ms. F. did not show for 49 of the 120 visits during this time, and Mr. H. did not show for 54 of the 120 visits.

Supervised visitation moved to the parents' home in September 2015, and continued there until May 2016. Shanna Porter, the DSHS case manager supervising the visits, noted that during these in-home visits, the parents frequently were unprepared and had to leave to get supplies.

9

Initially, Ms. Porter was pleased with the home's appearance, and the parents responded to concerns such as fixing smoke alarms and making electrical outlets safe. However, the condition of the home began to deteriorate. The parents refused to allow Ms. Porter to inspect portions of the home. Ms. Porter saw cat feces, animal vomit, cigarette butts, and a dead mouse. In May 2016, the visits were moved because of the continued deterioration of the home.

*Mr. H.'s expressions of anger and threats*

Mr. H. constantly expressed anger with Ms. Porter throughout the proceedings. He called her stupid and a liar several times, and muttered threats that he would kill himself. He sent several angry communications to her online.

Ms. F. and Mr. H. had another child, C.H., in May 2016. DSHS removed C.H. from his parents' care. Mr. H. was extremely upset and began making online threats to Ms. Porter and her supervisor saying that he would come "first thing in the morning." RP at 680. The next day he went to DSHS offices, visibly outraged and screaming. Shortly after, he returned and Ms. Porter heard him screaming 50 feet away and through the building's glass walls. Mr. H.'s unidentified companion threatened physical harm to DSHS staff. DSHS summoned police, and police advised Mr. H. that he no longer was permitted on DSHS property.

10

Mr. H. and Ms. F. were evicted from their home on May 31, 2016. The reasons they were evicted included Mr. H.'s continued marijuana use, the presence of four cats in the house without the landlord's permission, and Mr. H.'s anger issues.

The trial began June 28, 2016. During the 17 months between the shelter care hearing and the trial, Mr. H. and Ms. F. lacked housing during only the initial and the last month. During trial, the court made a record of the multiple times the parents were late returning from recess because they were smoking. At the conclusion, the trial court announced its decision to terminate Mr. H.'s and Ms. F.'s parental rights to A.H. During the trial court's oral decision, Mr. H. left the courtroom.

Mr. H. and Ms. F. appealed.

## ANALYSIS

Mr. H. argues there was insufficient evidence to support the trial court's findings that certain ordered services were offered or provided, that there was little likelihood that conditions could be remedied so that A.H. could be returned to him in the near future, that he was currently unfit to parent A.H., and that termination was in A.H.'s best interest.

Ms. F. argues that DSHS's burden of proof must be viewed through the lens of the Americans with Disabilities Act of 1990 (ADA), §§ 12101-12213. She also argues there was insufficient evidence to support the trial court's findings that certain ordered services

11

were offered or provided, and that there was little likelihood that conditions could be remedied so that A.H. could be returned to her in the near future.

## A. STANDARD OF REVIEW

All but two of the issues raised by the parents involve whether substantial evidence supports the trial court's findings under RCW 13.34.180(1). This court must affirm findings of fact under RCW 13.34.180(1) if substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence supports the findings. *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999). Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the matter asserted. *In re Welfare of S.J.*, 162 Wn. App. 873, 881, 256 P.3d 470 (2011). Clear, cogent, and convincing evidence exists when the ultimate fact at issue is "highly probable." *K.S.C.*, 137 Wn.2d at 925. Unchallenged findings are verities on appeal. *In re Interest of Mahaney*, 146 Wn.2d 878, 895, 51 P.3d 776 (2002).

Because the trial court hears the testimony and observes the witnesses, it is entitled to deference concerning credibility of witnesses or weight of the evidence. *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 243, 237 P.3d 944 (2010). If a trial court has resolved conflicting evidence, this court will not substitute its judgment for that of the trial court, even if this court would have resolved a factual dispute differently. *Mairs v. Dep't of*

*Licensing*, 70 Wn. App. 541, 545, 854 P.2d 665 (1993). The party claiming error has the

burden of showing that a finding of fact is not supported by substantial evidence. *Fisher*

*Properties, Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 369, 798 P.2d 799 (1990).

B.  GENERAL PROOF REQUIREMENTS FOR TERMINATION PROCEEDINGS

Parents have a fundamental liberty interest in the care, custody, and

companionship of their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct.

1388, 71 L. Ed. 2d 599 (1982). Therefore, the State may interfere with parents' rights

"'only for the most powerful [of] reasons.'" *S.J.*, 162 Wn. App. at 880 (internal

quotation marks omitted) (alteration in original) (quoting *In re Welfare of A.J.R.*, 78 Wn.

App. 222, 229, 896 P.2d 1298 (1995)). When the parental actions may cause harm or a

risk of harm to the child, the State has a right and responsibility to protect the child. *In re*

*Custody of Smith*, 137 Wn.2d 1, 18, 969 P.2d 21 (1998). Therefore, "reunification must

be balanced against the child's right to basic nurture, physical and mental health, and

safety; ultimately, the child's rights and safety should prevail." *In re Welfare of A.G.*, 155

Wn. App. 578, 589, 229 P.3d 935 (2010), *vacated on other grounds on remand*, 160 Wn.

App. 841, 248 P.3d 611 (2011).

Washington courts use a two-step process to determine whether to terminate

parental rights. RCW 13.34.180(1); *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d

13

1104 (2010). The first step focuses on the adequacy of the parents and requires the State

to prove the six statutory elements of RCW 13.34.180(1) by clear, cogent, and convincing

evidence. RCW 13.34.190(1)(a); *A.B.*, 168 Wn.2d at 911. The six statutory elements

required by the first step are:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the reasonable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. . . .

RCW 13.34.180(1). The second step asks whether termination is in the best interests of

the child. RCW 13.34.190(1)(b); *A.B.*, 168 Wn.2d at 925.

C.    SPECIFIC ISSUES RAISED BY THE PARENTS

1.    *RCW 13.34.180(1)(d): Services ordered were expressly and understandably offered or provided*

Mr. H. and Ms. F. contest the trial court's finding that DSHS offered or provided all court-ordered services.

To meet its burden under RCW 13.34.180(1)(d), DSHS must show it offered or provided the required services and the parent either failed to engage or waived their right to such services. *In re Welfare of S.V.B.*, 75 Wn. App. 762, 770, 880 P.2d 80 (1994). The services offered or provided must be tailored to the individual parent's needs. *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). A parent's unwillingness or inability to avail himself or herself of remedial services within a reasonable period is highly relevant to a court's determination of whether the elements of RCW 13.34.180 are established. *In re Dependency of C.T.*, 59 Wn. App. 490, 499, 798 P.2d 1170 (1990). A service is necessary if it is "needed to address a condition that precludes reunification of the parent and child." *In re Parental Rights to I.M.-M.*, 196 Wn. App. 914, 921, 385 P.3d 268 (2016).

a.    *Ms. F. failed to assert her ADA argument to the trial court, so we will not review it on appeal*

As an initial matter, Ms. F. contends that the ADA increases the burden on DSHS to tailor required services to her needs. Ms. F. cites several out-of-state jurisdictions for

the conclusion that compliance with the ADA is relevant to this court's determination of whether DSHS appropriately offered or provided court-ordered services. *See State ex rel. K.C. v. State*, 2015 UT 92, 362 P.3d 1248, 1252; *People in Interest of C.Z.*, 2015 COA 87, 360 P.3d 228, 233. The State does not respond to this argument.

Ms. F. did not assert her ADA argument to the trial court. Her failure to assert the argument to the trial court prevented the parties from developing a sufficient factual record as to whether Ms. F. was disabled for purposes of the ADA and also prevented the trial court from entering findings in this respect.

In general, an appellate court may refuse to review a claim of error that was not raised in the trial court. RAP 2.5(a). The general rule is subject to three exceptions. Ms. F. does not argue that any exception applies. For the reasons discussed above, we decline to review this undeveloped claim of error.

      *b.    Court-ordered services were offered or provided to Ms. F.*

The trial court ordered DSHS to provide the following services to Ms. F. so that her parental deficiencies could be remedied: a neuropsychological evaluation, individual counseling, family therapy, Project SafeCare parenting instruction, PFR parenting instruction, and two parenting assessments. Specifically, Ms. F. contests the finding that

DSHS sufficiently provided the PFR service to her. She argues the PFR service was not tailored to her learning limitations and that it was offered too late. We disagree.

Substantial evidence contradicts Ms. F.'s argument. Mr. Hanson was the PFR provider, and his testimony supports the finding. Mr. Hanson was aware of Ms. F.'s intellectual limitations, although he did not have the psychological report created by Dr. Mabee. Mr. Hanson considered Ms. F.'s limitations, and modeled skills and used repetition to account for her learning ability. Mr. Hanson also as part of all sessions offered "additional education based on observable behavior in that session." RP at 150.

PFR first began with two sessions in November 2015. Providers recommended PFR because although initial family therapy was positive, Ms. F. was having trouble recognizing A.H.'s cues. The first PFR session went well. Within two weeks, however, Ms. F. and Mr. H. began arriving without necessary supplies, including milk, diapers, food and wipes because they "forgot or were running late." RP at 158. Mr. Hanson talked about the necessity of having the appropriate supplies, and the parents were not receptive to his feedback. Because of the lack of engagement, the parents were placed back into family therapy.

Back in family therapy, Ms. F. and Mr. H. were detached, less responsive to feedback, argumentative, and defensive. They continued to arrive without necessary

17

supplies. Both parents began to frequently arrive late or not attend at all. Ms. F. attended only two scheduled sessions in February 2016, and in one of those sessions, did not bring any supplies.

Ms. F.'s engagement and attendance increased in March, but she still did not bring adequate supplies. She explained the deficiency as her roommates were drinking her milk. One time she brought a workout supplement instead of milk and another time she brought sugar water. Mr. Hanson questioned whether she was making child-centered decision making.

PFR began again at this point, and Ms. F. was referred to Ashley Suter for her new sessions. Ms. F. arrived over 15 minutes late for the first session on April 22, 2016, so that session was rescheduled to April 29, 2016. Ms. F. did not show for the next session on May 6, 2016. She was discharged from PFR at this point for noncompliance. At the request of Ms. F.'s attorney, Ms. Suter contacted her to reschedule, but Ms. F. could not work out a date and time that would work for her. Ms. F. was again discharged on May 13, 2016.

Despite being twice discharged for noncompliance with PFR, Ms. Porter referred Ms. F. for further PFR. Ms. F. was scheduled for intake on June 2, 2016, but again did not attend. By June 13, 2016, the PFR counselor still had not been able to communicate

18

with Ms. F. By the time of trial, Ms. F. had made no further attempts to engage with PFR services.

All indications from the record show PFR was reasonably tailored to Ms. F.'s abilities during the first referral. She was discharged from the program for lack of engagement and lack of attendance. She was further discharged from every other PFR referral because of further lack of attendance. The trial court found she was reasonably offered this service in a tailored fashion, and substantial evidence supports this finding.

        *c.*     *Court-ordered services were offered or provided to Mr. H.*

Mr. H. contends that DSHS never offered him any housing assistance, and housing assistance was necessary because it was the primary parental deficiency preventing reunification. "[A] juvenile court hearing a dependency proceeding has authority to order DSHS to provide the family with some form of assistance in securing adequate housing in those cases where homelessness or lack of safe and adequate housing is the primary reason for the foster placement or the primary reason for its continuation." *Wash. State Coalition for the Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 924, 949 P.2d 1291 (1997). But we disagree that the rule stated above applies here.

First, the trial court never identified homelessness as a primary parental deficiency. The trial court identified Mr. H.'s parental deficiencies as the cumulative effect of,

19

"chemical dependency issues, parenting issues, domestic violence issues, and the inability to meet the child's physical, emotional, and psychological needs." Clerk's Papers (CP) at 141.

Second, the record indicates that homelessness was not the basis for termination of Mr. H.'s parental rights. The basis for termination of Mr. H.'s parental rights included his untreated marijuana addiction and his inability to control his anger. Mr. H. and Ms. F. received housing assistance and used it to pay rent. The ability to afford housing was not at issue. They were evicted near the time of the termination trial because they violated their lease agreement that prohibited cats and because of Mr. H.'s ongoing marijuana use and his anger issues.

Mr. H. also argues that he needed housing assistance because he could not provide a safe home for A.H. The record does not support his argument. Ms. Porter was initially pleased with the house during her visits and the actions Mr. H. took to fix her safe housing concerns. She testified that the housing situation significantly deteriorated during subsequent walkthroughs. Mr. H. and Ms. F. began barring her from various rooms in the home. Nonetheless, Ms. Porter could see and smell extensive animal urine and animal vomit from the portions of the home the parents permitted her to see.

We conclude the evidence does not support Mr. H.'s contention that homelessness was a primary parental deficiency. We further conclude that the causes of Mr. H.'s homelessness near the time of the termination trial were nonfinancial causes, wholly within his and Ms. F.'s control.

2.    *RCW 13.34.180(1)(e): Likelihood that conditions will be remedied*

Ms. F. argues that DSHS failed to prove there was little likelihood that conditions would be remedied so that A.H. could be returned to her in the near future. We disagree.

DSHS must prove "[t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). The focus of this element is whether the identified deficiencies have been corrected. *In re Welfare of M.R.H.*, 145 Wn. App. 10, 27, 188 P.3d 510 (2008). If the parent is unable to resolve his or her deficiencies within 12 months after the child has been declared dependent, the statute provides a rebuttable presumption that there is little likelihood that conditions will change, and the burden of production shifts to the parent. *In re Welfare of T.B.*, 150 Wn. App. 599, 608, 209 P.3d 497 (2009). DSHS must still prove it is highly probable that the parent would not improve in the near future. *Id.*

"A parent's unwillingness to avail herself of remedial services within a reasonable period is highly relevant to a trial court's determination as to whether [the Department]

21

has satisfied RCW 13.34.180(1)(e)." *Id.* Even if some evidence suggests that the parent

may eventually be capable of correcting his or her deficiencies, termination is still

appropriate where the deficiencies will not be corrected within the foreseeable future.

*A.G.*, 155 Wn. App. at 590. The foreseeable future must be determined from the child's

point of view. *In re Dependency of P.D.*, 58 Wn. App. 18, 27, 792 P.2d 159 (1990).

Ms. F. does not assign error to the trial court's findings of fact IV or VIII, which

are therefore verities on appeal. Finding of fact IV states that A.H. was found dependent

on January 16, 2015, as to both parents. Finding of fact VIII states that the parents have

displayed an inability to change throughout the dependency, A.H. has been removed from

her parents for her entire two-year life, an adoptive home has been found, and only the

dependency proceeding was a barrier to that adoption. Because these findings establish

that Ms. F. had not been able to remedy her parental deficiencies within 12 months of the

dependency, the statutory presumption against the parent applies.

Ms. F. claims the record supports the idea that she might be able to remedy the

conditions that led to the dependency. We disagree. Her argument is both contrary to the

record and the trial court's findings. Moreover, once the statutory presumption against

the parent applies, Ms. F. must establish that she could remedy the conditions in the near

22

future, as measured by the child's perspective. Here, neither the record nor the trial court's finding supports this.

Ms. F.'s lack of engagement with services was a major theme throughout the termination proceeding. She frequently was not prepared, arrived late, or missed appointments. Ms. F. was constantly re-referred to services as a result of her lack of engagement. Even during trial, Ms. F. and Mr. H. were repeatedly late returning from trial recesses because they were smoking outside.

We conclude that substantial evidence supports the trial court's finding that there was little likelihood that conditions would be remedied in the near future so that A.H. could be returned to Ms. F.

3. *Parental unfitness of Mr. H.*

Mr. H. argues DSHS failed to sufficiently establish that he is currently unfit to parent A.H. We disagree.

Due process requires the trial court to explicitly or implicitly find by clear, cogent, and convincing evidence that the parent is currently unfit. *A.B.*, 168 Wn.2d at 918-19. A trial court cannot terminate a parent's rights absent this finding of unfitness. *Id.* at 918. Parental deficiencies alone do not render a parent currently unfit, "[t]he proper inquiry is whether the existing parental deficiencies, or other conditions, prevent the parent from

23

providing for the child's basic health, welfare, and safety." *In re Parental Rights to*

*K.M.M.*, 186 Wn.2d 466, 493, 379 P.3d 75 (2016). Here, the trial court made the

following finding relating to the challenged issue, a finding we review for substantial

evidence:

> Mr. [H.] is currently unfit in that the parental deficiencies set forth herein render the parent unable to safely parent the child. Mr. [H.'s] parental deficiencies include chemical dependency issues, parenting issues, domestic violence issues, and the inability to meet the child's physical, emotional, and psychological needs.
>
> . . . .
>
> It is the cumulative effect of all the deficiencies identified that make the parent's [sic] currently unfit to parent.
> The parents are barely able to take care of themselves. . . .

CP at 141. Mr. H. specifically contests the trial court's findings that his drug use and

domestic violence issues are parental deficiencies that render him unfit to parent.

    *a.    Mr. H.'s chemical dependency*

Mr. H. argues that his marijuana use does not interfere with his parenting ability

and that he uses marijuana to reduce pain. We disagree. The record supports the trial

court's finding that this deficiency contributed to his lack of fitness.

Ms. Aleman provided a chemical dependency evaluation for Mr. H. The

evaluation showed that Mr. H. was dependent on nicotine and cannabis. His cannabis use

was increasing because of his growing tolerance. Mr. H. could not reduce his usage

24

amounts when he tried. He smoked daily. Another provider stated that Mr. H. had no interest in stopping his marijuana use and did not recognize the negative consequences of use, and that marijuana use had once cost Mr. H. his job. As discussed above, marijuana use contributed to at least one instance of homelessness.

The trial court heard testimony that people can become dependent even on legal substances. The trial court heard testimony marijuana use affects attention and influences ability to attend services. The trial court directly asked Dr. Mabee a number of questions about the use of marijuana on the body. Dr. Mabee testified marijuana affected neurological functions, including the abilities to multi-task, stay organized, and manage learning. Usage affects attention and concentration, which also implicates memory. Chronic usage enhances these impairments and deficits. Dr. Mabee concluded that marijuana use affected parenting skills: "[C]annabis's effect on concentration, attention, being able certainly to multi-task gets impaired, the ability to make another individual's needs a priority, all of those can be affected by chronic use." RP at 456.

The record also shows that Mr. H. is committed to his marijuana dependency. Mr. H. first began using marijuana recreationally in 1999 but began using it to medicate pain in 2008. He testified that he does not have a medical marijuana prescription and has no interest in medical alternatives. He uses marijuana at least three times per day, and his

25

urinalysis results have shown the same consistent use for the entirety of the dependency

process. During his testimony, the following exchange took place:

> [Counsel:] If—if a court determined that you needed to stop using marijuana to safely parent [A.H.], would you do it?
> [Mr. H.:] I'd appeal it.
> [Counsel:] You'd appeal it?
> [Mr. H.:] Uh-huh.
> [Counsel:] You would appeal the court's decision?
> [Mr. H.:] Yes, I would.

RP at 414. Mr. H. regularly missed meetings, was late to meetings, and had trouble

putting A.H.'s needs before his own interests, all negative consequences associated with

marijuana use, as testified to in the record. We conclude that the record supports the trial

court's finding that marijuana use contributed to Mr. H.'s parental fitness.

          *b.     Mr. H.'s domestic violence and threatening behavior*

Mr. H. attempts to explain the reasonableness of certain episodes of domestic

violence and threatening behaviors. Minimizing these problems, he argues that the trial

court's finding that domestic violence contributed to his parental unfitness is not

supported by substantial evidence. We disagree.

Mr. H. has a lengthy history of domestic violence. He was convicted of second

degree assault for breaking the legs of an infant child of his. Courts had issued protective

orders against him for the purpose of protecting his past girlfriends. Mr. H. had even

violated one or more of those orders. The trial court also heard testimony that Mr. H. self-reported yelling at, shouting at, and controlling the money of his partners.

In addition, Mr. H.'s propensity toward domestic violence is supported by evidence of his aggressive and confrontational nature. Mr. H. threated A.H.'s foster parents after a session with A.H. He sent threatening communications to Ms. Porter. He sent threatening communications to DSHS after another child was removed and showed up at DSHS the next day, screaming so loud from outside the building that he could be heard inside. In addition, he posted threats to others on Facebook, vowing revenge.

Mr. Erickson provided individual counseling to Mr. H. He identified anger management and impulse control as part of Mr. H.'s mental health issues. Mr. Erickson noted that Mr. H. would become aggressive when he felt defensive, such as when interacting with DSHS. Mr. Erickson noted these issues contributed to Mr. H.'s recent eviction.

We conclude that substantial evidence supports the trial court's finding that Mr. H.'s history of domestic violence is a factor that contributed to his parental unfitness.

    4.    *RCW 13.34.190(1)(b): Termination is in the best interests of A.H.*

27

Finally, both Mr. H. and Ms. F. challenge the trial court's finding that termination is in the best interests of A.H. They additionally contend that the finding was premature. We disagree.

Mr. H. minimally cites to the record to show that he and A.H. had begun to bond. He offers no other argument and does not explain why this court should substitute its judgment for that of the trial court. Here, the trial court entered the following uncontested finding: "Continuation of the parent-child relationship diminishes the child's prospects for early integration into a permanent and stable home. . . . A permanent, adoptive home has been identified for the child, and the only barrier to adoption is parental rights." CP at 142. The trial court also explicitly gave weight in its findings to the court appointed special advocate's testimony that termination was in the best interests of A.H. We reject Mr. H.'s argument because we do not reweigh conflicting evidence.

As mentioned earlier, termination of parental rights is a two-step process. *A.B.*, 168 Wn.2d at 925. The trial court must always consider the first step—alleged unfitness of the parent as outlined by RCW 13.34.180—before moving to the second step, which focuses on the child's best interests. *Id.*

Mr. H. and Ms. F. both argue that the trial court was premature in determining termination was in the best interests of A.H. They argue the trial court's findings

pertaining to RCW 13.34.180(1) were erroneous, and for this reason, the trial court never properly considered the first step before progressing to the second. In other words, their argument on this issue depends on this court deciding the previous issues in their favor. Because we determined those issues unfavorably to the parents, their argument here must also fail. We conclude that the trial court did not prematurely consider A.H.'s best interests.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____          _____
Fearing, C.J.                                              Pennell, J.

29